# EXHIBIT B

# OPINIONS OF THE ATTORNEY GENERAL OF CALIFORNIA

*with* INDEX DIGEST

VOLUME 37
*(January-June, 1961)*

EDITED BY
WARREN L. HANNA

*Published and Distributed*
*by*
HANNA LEGAL PUBLICATIONS
1029 POMONA AVENUE, ALBANY 6, CALIFORNIA

In the analysis of statutes to find the legislative intent regard is to be had not so much to the exact phraseology in which the intent has been expressed as to the general tenor and scope of the entire scheme embodied in the enactments. While the intent must be ascertained from the words used to express it, the manifest reason and obvious design of the law should not be sacrificed to a literal interpretation of such language (*Los Angeles County* v. *Frisbee*, 19 Cal.2d 634; *Los Angeles* v. *Barrett*, 153 Cal.App.2d 776).

Mere literal construction of a section in a statute ought not to prevail if it is opposed to the intention of the Legislature apparent by statute and if the words are sufficiently flexible to admit of some other construction it is to be adopted to effectuate that intention (*Select Base Materials, Inc.* v. *Board of Equalization*, 51 Cal.2d 640; *In re Haines*, 195 Cal. 605).

Since section 172a deals only with the prohibition against the sale, giving away or exposing for sale of alcoholic beverages within 1½ miles of the grounds or campus of universities, it is apparent that the phrase ". . . any license or the transfer thereof to any location . . ." is used in a restricted sense. The phrase "any license" applies only to those licenses to sell alcoholic beverages at locations within 1½ miles of either the University of San Francisco or the University of California Medical Center in San Francisco in existence at the time the conditions set forth in the statute became operative. Accordingly the transfer provision refers not to the transfer of any licenses but only to the transfer of those licenses to sell alcoholic beverages at locations within 1½ miles of either university.

---

Opinion No. 61-64—May 5, 1961

**SUBJECT:** STUDENT BODY ASSOCIATION—High school district, may pledge part of district's net gate receipts from athletic events to redeem certificates sold to local citizens to help finance construction of new stadium, if approved by governing board of district.

**Requested by:** ASSEMBLYMAN, 28th DISTRICT

**Opinion by:** STANLEY MOSK, Attorney General

Lawrence E. Doxsee, Deputy

Honorable Clark L. Bradley, Assemblyman from the Twenty-eighth District, has requested the opinion of this office on the following question:

May the student body associations of a high school district pledge a fraction of the district's stadium's net gate receipts?

The conclusion is as follows:

Student body associations may make and honor the proposed pledges, subject to the approval of the governing board of the district.

## ANALYSIS

The Thomas P. Ryan Memorial Foundation is a non-profit corporation formed for the purpose of raising money for the construction of a stadium for the East Side Union High School District in San Jose. The articles of incorporation name the district's director of athletics as president and other local persons as the other officers and directors.

When the foundation has raised sufficient money, it will give this money to the district. The transfer of the money will be a gift as far as the district is concerned, and no promise of repayment from any source will be made by the district (see Education Code §988). The stadium will be constructed on school property and owned by the district.

The foundation proposes to raise money by selling certificates to local persons. Approval of the sale and issuance of the certificates will, of course, be first obtained from the Corporations Commissioner.

In order to encourage the sale of the certificates, it is proposed that the studnet body associations of the high schools of the district annually pledge to the foundation a certain fraction of the stadium's net gate receipts for the redemption of the certificates. The certificates are to be non-transferable because some purchasers will undoubtedly prefer not to redeem their certificates and thus make a gift to the foundation.

The question that has arisen is whether the student body associations may so pledge.

Authority for the organization of a student body association is contained in the Education Code, section 10701. As stated in that section, "any group of students may organize a student body association within the public schools." The purpose of such an association is declared to be "the conduct of activities on behalf of the students."

Statutory limitations on the powers of a student body association to carry out its broad purpose are few (see Ed. Code §§10701-05; 14 Ops. Cal. Atty. Gen. 210, 211 (1949)). Although an association may not engage in any activity "in conflict with the authority and responsibility of the public school officials." statutory limitations on a school district do not automatically apply to a student body association (14 Ops. Cal. Atty Gen. 210 (1949); 17 Ops. Cal. Atty. Gen. 181 (1951)). The primary limitation on an association is its "subject[ion] to the control and regulation of the governing board of the school district" (Ed. Code §10701).

In 14 Ops. Cal. Atty. Gen. 210 (1949) it was concluded that the promotion of athletics is a proper student body association activity and that leasing a stadium is similarly proper. The proposed pledges are not so different from the contractual promises approved in that opinion as to require a different conclusion. Therefore the student body associations may make and honor the proposed pledges.

In order to reduce misunderstandings, the pledges specifically should state that the members of the associations are not personally liable, that only the net gate receipts of the current school year are being pledged, and that other funds or property of the associations are not being pledged (see Calif. Const., Art. XI, §18; *City of Oxnard* v. *Dale*, 45 Cal.2d 729 (1955)). The pledges should also recite that

the governing board of the school district has ultimate control over the associations and the use of the stadium, including the charging of admission and the allocation of any gate receipts, and that the pledges are subject to the approval of the governing board.

---

### Opinion No. 60-172—May 8, 1961

**SUBJECT:** BUY AMERICAN ACT—Would not prohibit state from buying Italian hydrofoil ferries if of a class or kind not produced in United States, but such ferries could not be operated on San Francisco Bay under federal regulations without special act of Congress.

**Requested by:** SENATOR, 14th DISTRICT

**Opinion by:** STANLEY MOSK, Attorney General
Michael Traynor, Deputy

Honorable J. Eugene McAteer, Senator, Fourteenth District, has requested the opinion of this office on the following questions:

1. Does California's Buy-America Act (Gov. Code §§4300-4305.5) prohibit California from buying Italian hydrofoil ferries?

2. Does federal law prohibit the use of Italian hydrofoils as ferries on waters such as San Francisco Bay?

The conclusions may be summarized as follows:

1. California's Buy-America Act does not prohibit California from buying Italian hydrofoil ferries if the ferries "are of a class or kind which are not, or which are manufactured from materials which are not, produced in the United States" (Gov. Code §4301). Whether the ferries are of such a class or kind is a question of fact to be decided initially by the purchasing official.

2. Federal law prohibits the use of Italian hydrofoils as ferries on waters such as San Francisco Bay. Before buying Italian hydrofoils, the state should consider securing a special act of Congress granting permission so to use them.

### ANALYSIS

The Italians make hydrofoil ferries, popularly known as "foilers" or "flying boats," and successfully use them on their waters.[1] The ferries obviously suggest

---

[1] A hydrofoil is a vessel which rides on wing-like foils on struts below the body of the craft itself. As speed develops, the foils lift the vessel above the water. Speeds achieved are far greater than those achieved by ordinary craft. The United States Maritime Administration is expected to launch a hydrofoil ship in the summer of 1961. The eighty-ton, 104 foot craft is nearing completion by Dynamic Developments, Inc., a subsidiary of the Grumman Aircraft Engineering Corporation. (Dep't. of Commerce, Fed. Maritime Bd.-Maritime Admin., Release No. MA NR 61-27, Mar. 31, 1961; N.Y. Times, Mar. 31, 1961, p. 46M, col. 2 (city ed.).) Grumman is apparently the only major American manufacturer which has ventured into the hydrofoil business. (See generally, Schertel, Hydrofoil Boats as a New Means of Transportation, 71 Am. Soc. Naval Eng. J. 603, Nov. 1959; Armagnac, 100-Knot Liner to Ply on Sea Wings, 174 Popular Science, No. 3, 106, March, 1959. Various other articles are cited in the Readers Guide, The Engineering Index, and The Applied Science and Technology Index for the years 1957-61.)