Seth M. Galanter*
National Center for Youth Law
712 H Street NE, Suite 32020
Washington, DC 20002
Ph: (202) 868-4781
Fax: (510) 835-8099
Email: sgalanter@youthlaw.org

Adele P. Kimmel (CA Bar No. 126843)
Alexandra Z. Brodsky*
Public Justice
1620 L Street NW, Suite 630
Washington, DC 20036
Ph: (202) 797-8600
Fax: (202) 232-7203
Email: akimmel@publicjustice.net
        abrodsky@publicjustice.net

John He (CA Bar No. 328382)
Public Justice
475 14th Street, Suite 610
Oakland, CA 94612
Ph: (510) 622-8150
Fax: (202) 232-7203
Email: jhe@publicjustice.net

Linda M. Correia*
Lauren A. Khouri*
Correia & Puth, PLLC
1400 16th Street NW, Suite 450
Washington DC 20036
Ph: (202) 602-6500
Fax: (202) 602-6501
Email: lcorreia@correiaputh.com
        lkhouri@correiaputh.com

*admitted pro hac vice

Counsel for Plaintiff The Women's Student Union

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

THE WOMEN'S STUDENT UNION,

     *Plaintiff*,

     v.

U.S. DEPARTMENT OF EDUCATION,

     *Defendant*.

Civil Action No. No. 3:21-cv-01626-EMC

Judge: Honorable Edward M. Chen

# FIRST AMENDED COMPLAINT

# FOR INJUNCTIVE AND DECLARATORY RELIEF

# ADMINISTRATIVE PROCEDURE ACT CASE

Plaintiff, The Women's Student Union, brings this action against the U.S. Department of Education seeking to set aside its 2020 Regulations – promulgated under the authority of then-Secretary Betsy DeVos – that reduce federal protections students enrolled in public school have from sexual harassment, including sexual violence, under Title IX of the Education Amendments of 1972.

# INTRODUCTION

1.     Sexual harassment, including sexual violence, has been too common an experience of students at public schools across the country. Women and LGBTQ students are more likely to experience such harassment than other student populations.

2.     Sexual harassment poses an obstacle to students' ability to learn and thrive in school. When young people are sexually harassed by classmates or teachers, they avoid school and develop mistrust of educational institutions. Their academic performance suffers. They often drop classes or leave school altogether. And this is to say nothing of the lasting physical and psychological harm from sexual harassment.

3.     Students experience these injuries not due to the harassment alone, but often because their schools fail to respond to the harassment promptly and appropriately.

4.      Just like young people at schools across the country, many high school students enrolled in California's Berkeley Unified School District ("BUSD") experience sexual harassment.

5.      For example, at Berkeley High School ("BHS"), students are often told they must either share a classroom with a student who sexually assaulted them off campus – or the victim must leave the class. Even when learning takes place primarily online, as it did in the 2020-2021 school year due to COVID-19, victims are required to be in small video "breakout rooms" with their harasser.

6.      Such unchecked harassment is not inevitable. Title IX of the Education Amendments of 1972, which prohibits sex discrimination in schools that receive federal funds, is a critical federal law that students have long relied on as a tool for getting schools to address sexual harassment.

7.      For decades, the U.S. Department of Education, which is the primary federal agency charged with enforcing Title IX, informed schools that they were responsible under Title IX for responding to any sexual harassment of students that they knew or should have known about, so long as the harassment was sufficiently serious that it adversely affects a student's ability to participate in or benefit from the school's program.

8.      In 2020, under the leadership of then-Secretary Betsy DeVos, the Department issued Regulations that purported to effectuate Title IX but, in fact, weakened key protections for those who experience sexual harassment and disincentivized school districts from learning about or responding to sexual harassment experienced by their students. See 85 Fed. Reg. 30,026 (May 19, 2020) (codified at various places in 34 C.F.R. § 106). The 2020 Regulations went into effect August 14, 2020.

9.      Without adequate justification or explanation, the Department undermined the existing sexual harassment framework by changing the "what," "where," "when," and "how" of its prior interpretations of Title IX.

10.      *What*: The 2020 Regulations constrict what misconduct constitutes unlawful sexual harassment that schools need to respond to under Title IX. Harassment can no longer

1  trigger a school's responsibilities to a victim merely due to its severity or its pervasiveness – both

2  must be present.

3        11.    *Where*: The 2020 Regulations exclude from Title IX coverage sexual harassment

4  of students by other students or faculty if the harassment took place off school grounds and was

5  not part of a school program (such as a field trip). The fact that the harmful effects of the

6  harassment are experienced by students while at school and diminish their educational

7  opportunities is no longer sufficient.

8        12.    *When*: The 2020 Regulations restrict when a school district is obligated to

9  investigate and redress sexual harassment under Title IX. Now, the school district must only act

10  when certain delimited school employees have actual knowledge of the harassment. The

11  Regulations completely eliminate a school district's responsibility when it should have known

12  about the harassment, but did not actually know.

13        13.    *How*: The 2020 Regulations alter how the Department will assess whether a

14  school district complied with its obligation to investigate and redress harassment under Title IX.

15  Instead of asking whether the school had taken prompt and effective steps reasonably calculated

16  to end the harassment, eliminate the hostile environment, prevent its recurrence, and, as

17  appropriate, remedy its effects, the Regulations require only that the school provide remedies

18  designed to restore or preserve equal access to the student who complained about the harassment.

19  And instead of asking whether a school had met its obligations under Title IX, the Department

20  now asks only whether the school acted with deliberate indifference, i.e., in a clearly

21  unreasonable way.

22        14.    The 2020 Regulations reduce schools' incentives and hinder their abilities to take

23  preventive or remedial action, and will therefore cause even more women and LGBTQ students

24  to experience sexual harassment.

25        15.    These regulatory changes are denying students the legal protections of Title IX

26  that they previously enjoyed, and are denying WSU the benefit of having the Department

27  investigate and redress many types of harassment its members and other students have

28  experienced and are currently experiencing at BHS.

## PARTIES

16.     Plaintiff, The Women's Student Union (WSU), is an unincorporated association and an approved student body association of the Berkeley Unified School District of Berkeley, California.

17.     Defendant is the U.S. Department of Education. The Department implements Title IX through issuing regulations and guidance documents and is tasked with administrative enforcement of Title IX, 20 U.S.C. § 1682. Its principal address is 400 Maryland Avenue, S.W., Washington, D.C. 20202.

## JURISDICTION

18.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because it arises under federal law, e.g., Title IX of the Education Amendments of 1972 and the Administrative Procedure Act (APA). This Court also has jurisdiction pursuant to 28 U.S.C. § 1346(a)(2) because a department of the United States is a defendant.

## VENUE

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1)(C) because WSU resides (i.e., maintains its principal place of business, *id*. § 1391(c)(2)) in this District and no real property is involved in the action.

## INTRADISTRICT ASSIGNMENT

20.     Venue is proper in either the San Francisco or Oakland Division pursuant to Civil Local Rule 3 2(d) because this action arises in Alameda County.

## ALLEGATIONS

21.     Title IX of the Education Amendments of 1972 provides, subject to certain exceptions not relevant here, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX defines "program or activity" in relevant part as "all of the operations" of a school, "any part of which is extended Federal financial assistance." 20 U.S.C. § 1687.

22.     For nearly 50 years, this federal law has given students a critical civil rights tool to fight sex discrimination and promote equal access to educational benefits and opportunities. While these protections extend to all students, they have been particularly beneficial to girls and women, who had been historically excluded from many educational programs and opportunities.

23.     It is settled by multiple decisions of the U.S. Supreme Court that Title IX's prohibition against sex discrimination includes protection against sexual harassment that can be enforced in federal court by injured students through an implied private right of action for compensatory damages and injunctive relief. *See Davis v. Monroe Cty Bd. of Educ.*, 526 U.S. 629 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998); *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60 (1992); *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979). In order to recover damages in a court action, a private plaintiff must show that a school district had actual knowledge of the harassment and acted with deliberate indifference.

24.     But Title IX is also administratively enforced by federal agencies that disburse funds to educational institutions. Congress "authorized and directed" federal agencies that provide financial assistance to education programs or activities to "effectuate the provisions of" Title IX "by issuing rules, regulations, or orders of general applicability." 20 U.S.C. § 1682. While such rules, regulations, or orders are not always enforceable through the private right of action, unresolved violations can result in the Department withholding federal education funds or a lawsuit. 20 U.S.C. § 1682.

25.     For decades, and through multiple Administrations, the U.S. Department of Education, through its Office for Civil Rights, has been the primary federal agency charged with enforcing Title IX administratively and has issued consistent guidance to school districts about how it interpreted Title IX in the context of sexual harassment.

26.     Among the Department's Guidances are two that went through notice and comment – Sexual Harassment Guidance, 62 Fed. Reg. 12,034 (Mar. 13, 1997) ("1997 Guidance"); Revised Sexual Harassment Guidance, 66 Fed. Reg. 5,512 (Jan. 19, 2001), available at https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html ("2001 Guidance") – and a series of others issued by both Democratic and Republic Administrations, including:

- Sexual Harassment: It's Not Academic (1988),
  https://files.eric.ed.gov/fulltext/ED330265.pdf.
- Dear Colleague Letter (Jan. 25, 2006),
  https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html.
- Dear Colleague Letter: Harassment and Bullying (Oct. 26, 2010),
  https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html.
- Dear Colleague Letter on Sexual Violence (Apr. 4, 2011),
  https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.
- Questions and Answers on Title IX and Sexual Violence (Apr. 29, 2014),
  https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.
- Q&A on Campus Sexual Misconduct (Sept. 22, 2017),
  https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

27. The Department's harassment Guidances concerning sexual harassment consistently rejected the view that the standards adopted by courts to determine whether a private damages action could be brought against a school should be incorporated into the administrative enforcement process it oversees.

28. Although they varied in their level of detail and emphasis, these Guidances informed schools of the Department's consistent view that:

(1) unlawful "sexual harassment" means unwelcome conduct that denies or limits a student's ability to participate in or benefit from the school's program based on sex and can include conduct that is severe, persistent, or pervasive – in other words, sufficiently serious that it adversely affects a student's ability to participate in or benefit from the school's program;

(2) schools are required to address all harassing conduct that creates a hostile environment in an education program or activity, even if the conduct occurs outside an education program or activity;

(3) schools are responsible for any sexual harassment of students that they knew or, in the exercise of reasonable care, should have known about; and

*Plaintiff's First Amended Complaint for Injunctive and Declaratory Relief – 7*

(4)      schools must take prompt and effective action to end the unlawful harassment, prevent it from recurring, and remedy its effects.

29.      Other than the definition of sexual harassment, all these requirements also applied to all other forms of sex discrimination prohibited by Title IX, such as guidance counselors steering students of different sexes to different classes, teachers grading students more or less harshly on the basis of sex, or retaliation for raising concerns of sex discrimination.

30.      All these requirements were also consistent with the Department's Guidances concerning schools' responsibilities under Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act of 1990 to address race- and disability-based harassment, including:

- Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance, 59 Fed. Reg. 11,448 (Mar. 10, 1994), https://www2.ed.gov/about/offices/list/ocr/docs/race394.html.

- Dear Colleague Letter on Prohibited Disability Harassment (July 25, 2000), https://www2.ed.gov/about/offices/list/ocr/docs/disabharassltr.html.

- Dear Colleague Letter: Harassment and Bullying (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html.

31.      The Department's harassment Guidances around race and disability consistently rejected the view that the standards adopted by courts to determine whether a private damages action could be brought against a school should be incorporated into the administrative enforcement process it oversees.

32.      The Department continues to apply its traditional standards to students' claims of race and disability harassment. But, after the Department's 2020 Regulations, the same is not true for sexual harassment.

33.      Without adequate justification or explanation, the Department's 2020 Regulations – under then-Secretary Betsy DeVos – reduce protections to students from sexual harassment with regard to each of these elements by narrowly redefining "sexual harassment," "program or

activity," and "notice," and limiting its examination of whether schools had met their remedial obligations.

34.     Indeed, the Department acknowledged in the preamble to the 2020 Regulations that schools under the new Regulations will be required to engage in fewer investigations of sexual harassment, and thus will find fewer violations and provide fewer remedies. This was viewed as feature, not a flaw, of the Regulations.

35.     Although the Department refused to acknowledge it, the inevitable result of fewer investigations and fewer remedies will be an increase in the amount of sexual harassment, as would-be harassers will no longer be deterred by fear of being caught and disciplined, or have the opportunity to learn to change their behavior thanks to an educational intervention. Yet the Department never grappled with the tradeoff between increased sexual harassment and the purported benefits it attributed to the Regulations.

36.     With the changes adopted by the 2020 Regulations, the Department provides less protection to students who experience sexual harassment than to students who experience other forms of sex discrimination prohibited under Title IX, as well as race discrimination (including harassment) prohibited under Title VI and disability discrimination (including harassment) prohibited under the Rehabilitation Act and the Americans with Disabilities Act. The Department offered no justification or evidence that would support a weaker standard for sexual harassment relative to all other forms of discrimination and harassment.

### *Limiting what constitutes sexual harassment under Title IX*

37.     The 2020 Regulations adopted a novel and narrow definition of "sexual harassment" that is inconsistent with Title IX's text and purpose, and excludes multiple forms of misconduct that interfere with equal access to educational opportunities.

38.     The 2020 Regulations define sexual harassment as conduct on the basis of sex that is unwelcome conduct determined by a reasonable person to be so "severe, pervasive, *and* objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." 34 C.F.R. § 106.30 (emphasis added).

39.     Without adequate justification or explanation, this new definition substantially departs from the traditional definition for sexual harassment (and race- and disability-based harassment) that the Department has instructed schools to apply for more than two decades.

40.     The Department previously defined unlawful sexual harassment as unwelcome conduct of a sexual nature that "is sufficiently severe, persistent, *or* pervasive to limit a student's ability to participate in or benefit from an education program or activity." (emphasis added).

41.     Under this traditional definition, the Department applied a sliding scale: a single or isolated incident of sexual harassment could, if sufficiently severe, constitute unlawful sexual harassment without being repetitive or ongoing in nature, whereas less severe but ongoing or pervasive conduct that limited a student was also considered to be unlawful harassment prohibited by Title IX.

42.     Under the 2020 Regulations, however, a school is no longer required to investigate and remedy an egregious but isolated incident of sexual harassment (unless it falls within the 2020 Regulations' definition of "sexual assault" or quid pro quo harassment) because such harassment is no longer sufficiently "pervasive" to fall within the Rule's narrowed definition of sexual harassment. Misconduct such as indecent exposure, a request for sexual favors, some kinds of unwanted touching, and sharing of sexual images and videos are likely all excluded under the 2020 Regulations. Yet this conduct can produce the very exclusionary effects that the text of Title IX proscribes.

43.     Conversely, misconduct that is pervasive but not independently severe – such as some persistent sexual comments about a student's body – would likewise be excluded. This conduct, too, can produce the very exclusionary effects that the text of Title IX proscribes.

44.     The 2020 Regulations further narrow sexual harassment to conduct that "effectively denies a person equal access" to education. Title IX protects students from being "excluded from participation in," "denied the benefits of," and "subjected to discrimination under" a program or activity. 20 U.S.C. § 1681(a). Nonetheless, contrary to the statutory text, and without a reasoned explanation, the Regulations provide that only students who are "effectively denied" access are protected from misconduct.

45.     Only a small portion of sexual harassment of students is reported to school authorities. Students often choose not to report because they think the harassment is not serious enough or that no one would do anything to help. The 2020 Regulations' narrowed definition of "sexual harassment" will undoubtedly reduce reporting even further as students reasonably fear that schools will not provide any meaningful response if they file a report.

### *Limiting where Title IX's protections apply*

46.     The 2020 Regulations adopted a novel and narrow definition of "program or activity" for sexual harassment that is inconsistent with Title IX's text and purpose, and excludes multiple forms of misconduct that interfere with equal access to educational opportunities.

47.     This definition is inconsistent with the definition the Department uses for all other forms of sex discrimination, and for race or disability discrimination (including harassment).

48.     In the context of sexual harassment, a school is only responsible for sexual harassment "in" its "program or activity;" and "program or activity" is defined to "include[ ] locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution." 34 C.F.R. § 106.44(a).

49.     Without adequate justification or explanation, this new definition substantially departs from the traditional definition for sexual harassment that the Department has instructed schools to apply. The Department previously required schools to investigate harassment that occurred or originated off campus to determine whether the effects of that harassment are affecting a student's access to a school's program or activity.

50.     This new definition is not in accordance with the statute. Title IX does not require that the harassment take place "in" an education program or activity. Title IX is not concerned with where the underlying conduct occurred, but whether the person is "denied the benefits of, or [is] subjected to discrimination under any education program or activity."

51.     Sexual harassment can often occur in the first instance outside the "substantial control" of a school but nonetheless can deny students educational benefits and exclude them

from equal participation. Focusing on the location of the harassment, and not its effects on the student, leads to absurd results. For example, a school would have no responsibility to respond under the 2020 Regulations when a student or teacher sexually assaults another student so long as the assault occurred off school grounds and not during a school activity. And yet, even if the conduct results in the student becoming too afraid to attend the class taught by, or shared with, the victim's assailant, the 2020 Regulations immunize the school from any responsibility.

52.     Online harassment is another circumstance where the 2020 Regulations would lead to absurd results. Such online sexual harassment is particularly prevalent in high schools. Yet, under the 2020 Regulations, whether a school must respond to such misconduct will depend on whether the device used to harass is school-owned or privately-provided, whether the device is using the school's Wi-Fi or not, or whether the device is on or off school grounds when the harassing message is sent. From the student on the receiving end, however, the effect is the same. This is especially true during the COVID-19 pandemic, since remote learning has further blurred the line between harassment "in" and "out" of school. And harassers will learn that they can avoid accountability at school by simply targeting students using personal devices off school grounds.

53.     Only a small portion of sexual harassment of students is reported to school authorities. The 2020 Regulations' narrowed definition of "program or activity" will leave students uncertain about whether their school will investigate their complaint, particularly when those students are unlikely to know the location of the harasser or the device used. This will undoubtedly reduce reporting even further.

### *Limiting when a school district is responsible for sexual harassment affecting students in its programs*

54.     The 2020 Regulations adopted a novel requirement of "actual knowledge" for sexual harassment that is inconsistent with Title IX's text and purpose, and will exclude from Title IX's coverage significant amounts of misconduct that interfere with equal access to educational opportunities.

55.     This requirement is inconsistent with the requirement the Department uses for all other forms of sex discrimination, and for race or disability discrimination (including harassment).

56.     The 2020 Regulations provide that elementary and secondary schools will only be responsible for addressing sexual harassment when a school employee has "actual knowledge" of the harassment or allegations of the harassment. 34 C.F.R. §§ 106.30(a), 106.44(a).

57.     Without adequate justification or explanation, this new requirement substantially departs from the traditional position of the Department, which required schools to address sexual harassment if almost any school employee either "knew or should reasonably have known" about a student-on-student incident or an employee-on-student incident that occurred outside the context of the employee's provision of aid, benefits, and services to students.

58.     Under the 2020 Regulations, schools will lack the incentives to develop systems to detect sexual harassment and to encourage students to report sexual harassment. To the contrary, schools and their employees will be incentivized to avoid having "actual knowledge" of sexual harassment so that they are not required to address it – even if they believe or have reason to believe that a student is experiencing the adverse effects of harassment.

### *Limiting how the Department will determine whether a school district has appropriately responded to sexual harassment under Title IX*

59.     The 2020 Regulations adopted truncated and exceedingly deferential requirements about the remedies a school needs to provide after it determines there has been unlawful sexual harassment that are inconsistent with Title IX's text and purpose, and do not address the school-wide effects that can result from such harassment.

60.     The 2020 Regulations require a school to provide students who experienced unlawful sexual harassment and complained about it "remedies designed to restore or preserve equal access" and may impose "disciplinary sanctions" on a student found responsible for harassment after following an elaborate grievance procedure. 34 C.F.R. § 106.45(b)(1)(i). The Regulations further provide that the Department will find a school violated its remedial obligations only if it responded in a manner that is "deliberately indifferent." 34 C.F.R.

§ 106.44(a). The Department will find a school is deliberately indifferent only "if its response to sexual harassment is clearly unreasonable in light of the known circumstances." *Id.*

61.     Without adequate justification or explanation, these new limitations substantially depart from the traditional position of the Department, which required schools, after a finding of unlawful sexual harassment, to take prompt and effective steps reasonably calculated to end the harassment, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects.

62.     The Department does not impose these limitations for all other forms of sex discrimination, or for race or disability discrimination (including harassment).

63.     Just addressing the harm caused by unlawful sexual harassment to the student who complains is insufficient. Interventions for an entire class or school may be necessary to eliminate the hostile environment created by the harassment that only a single student complained of. Such remedies serve to eliminate the effects the discrimination had on the program, not just the parties to a specific complaint.

64.     The 2020 Regulations permit a school to respond unreasonably to complaints of sexual harassment, so long as its response is not "clearly" unreasonable. This safe harbor for schools is inappropriately restrictive and will lead to more inappropriate responses to known harassment.

***The Department's complaint process grants persons procedural rights to an investigation and resolution of timely written complaints that indicate a possible failure to comply with the Department's Title IX regulations***

65.     In 1975, when it first adopted its Title IX regulations, the Department of Education incorporated an existing regulation establishing a complaint process to address private complaints that a recipient of federal funds is discriminating. 34 C.F.R. § 106.71 (Title IX regulation incorporating the procedural provisions of the Department's Title VI regulations, 34 C.F.R. §§ 100.7-100.8). Those regulations grant persons like WSU and its members procedural rights to an investigation of a written complaint (if the complaint indicates a failure of a recipient

1  to comply with the regulations) and a written notice of the reasons for the disposition of the

2  complaint.

3       66.    The Office for Civil Rights has issued a *Case Processing Manual* ("CPM"),

4  available at https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf. The most recent

5  version, and the version in effect when WSU filed its complaint, was issued on August 26, 2020.

6  The *Case Processing Manual* "provides OCR staff and stakeholders with information regarding

7  how OCR promptly and effectively investigates and resolves complaints."  CPM at 2.

8       67.    The Department's regulations authorize "[a]ny person who believes himself or

9  any specific class of individuals to be subjected to discrimination prohibited by [the regulations]"

10  to file "a written complaint" with the Department's Office for Civil Rights. 34 C.F.R. § 100.7(b).

11  The Department has thus created an administrative procedure open to all persons to file

12  complaints on behalf of themselves or on behalf of a "specific class of individuals."

13       68.    Although the regulations do not define the term "person," the U.S. Department of

14  Justice has stated that a "private entity," regardless of corporate status, is a "person" protected by

15  Title VI, which is the statute that the Department of Education's regulations were initially

16  intended to effectuate. *See* U.S. Department of Justice, *Title VI Legal Manual*, § V.A at 1-2

17  (citing *Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 714 (4th

18  Cir. 2014); *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702, 705 (2d Cir. 1982)

19  (Friendly, J.)), available at https://www.justice.gov/crt/book/file/1364106/download. The

20  Department of Justice also states in its *Manual* that even if an entity is not a "person" for

21  purposes of the statute (because it is a state instrumentality, for example), "this should not

22  preclude" such an entity from bringing an "administrative complaint either on its own behalf or

23  on behalf of its students or other constituents." *Id.* § V.A at 3.

24       69.    The *Case Processing Manual* provides that the Office for Civil Rights "will

25  promptly acknowledge, in writing, the receipt of the complaint. OCR will also inform the

26  complainant that the complaint will be evaluated to determine whether OCR will proceed to

27  investigate the allegations and that further communications about complaint processing will be

28  forthcoming." CPM § 104.

*Plaintiff's First Amended Complaint for Injunctive and Declaratory Relief* – 15

70.     The *Case Processing Manual* further provides that the Office for Civil Rights will seek written consent to reveal the complainant's identity to the recipient and witnesses when it is necessary in order to investigate and resolve the complaint. *Id*. § 104. The Office for Civil Rights' consent form, available at https://www2.ed.gov/about/offices/list/ocr/edlite-consentform.html, instructs that the complainant should sign the form if it "filed the complaint on behalf of yourself" or "on behalf of a class of people, rather than any specific person."  This form confirms that complainant need not be the person experiencing the effects of the violation of the regulations in order to have a procedural right to file a complaint with the Office for Civil Rights.

71.     Once a timely written complaint is received, the Department's regulations mandate that the Office for Civil Rights investigate a complaint whenever the complaint indicates a possible failure to comply with the regulations. The regulations provide that the Office for Civil Rights "*will* make a prompt investigation *whenever* a … complaint … indicates a possible failure to comply with this part," 34 C.F.R. § 100.7(c) (emphases added), and further identify elements that the investigation "should" include. The text of this regulatory provision thus evidences the Department's distinction between *what* the Office for Civil Rights *must* do whenever a complaint indicates a possible failure to comply (make a prompt investigation) and *how* it *should* do it.

72.     Although not using the regulatory language, the *Case Processing Manual* provides detail about how the Office for Civil Rights evaluates whether a complaint "indicates a possible failure to comply" with the regulations. The Office for Civil Rights claims the right to dismiss a complaint if it "lacks sufficient factual detail (e.g., who, what, where, when, how)" so that "OCR cannot infer that discrimination or retaliation may have occurred or may be occurring."  CPM § 108(b). But before it does so, the Office for Civil Rights "will contact" the complainant and "explain the information necessary for OCR to open an investigation" and only dismiss if the complaint is insufficient "on its face or as clarified." *Id.* The *Case Processing Manual* further provides that at the conclusion of the evaluation process the Office for Civil Rights "will" issue a letter to the complainant reporting that it has decided to open a complaint

for investigation, *id*. § 111, or "explaining the reason for the decision" to dismiss the complaint without investigation, *id*. § 108.

73.     If the investigation finds no violation, the Office for Civil Rights "will so inform the recipient and complainant, if any, in writing."  34 C.F.R. § 100.7(d)(2). But if the investigation "indicates a failure to comply" with the regulations, the Office for Civil Rights "will so inform the recipient and the matter will be resolved by informal means whenever possible." 34 C.F.R. § 100.7(d)(1). The *Case Processing Manual* requires that the Office for Civil Rights also inform the complainant when it plans to resolve the complaint by informal means. CPM §§ 302, 303(b), 303(e). In this context, "informal means" refers primarily to the Office for Civil Rights entering into a binding agreement with the recipient that resolves any failures to comply, which the *Case Processing Manual* refers to as a resolution agreement.

74.     If the matter cannot be resolved by informal means, "actions will be taken [by the Office for Civil Rights] as provided in § 100.8," 34 C.F.R. § 100.7(d)(1), which identifies "suspension or termination of or refusal to grant or to continue Federal financial assistance;" or "by any other means authorized by law," which includes, but is not limited to, "reference to the Department of Justice with a recommendation" to file a lawsuit against the recipient. 34 C.F.R. § 100.8(a). The *Case Processing Manual* likewise explains that if the Office for Civil Rights finds that the recipient has violated the regulation and the recipient will not enter into a resolution agreement with the Office for Civil Rights, the Office for Civil Rights "*will* either (1) initiate administrative proceedings to suspend, terminate, or refuse to grant or continue financial assistance from … the Department to the recipient; or (2) refer the case to DOJ for judicial proceedings to enforce any rights of the United States under any law of the United States." Art. VI (emphasis added).

75.     To avoid the threat of fund termination or a lawsuit, school districts almost always are willing to resolve a matter by informal means by settling with the Department during or after an administrative investigation by agreeing to address sexual harassment through individual relief and systemic change.

1

### The Women's Student Union and its members

2    76.    WSU is an approved student body association of the Berkeley Unified School

3 District of Berkeley, California as described in California Education Code §48930. Under

4 California Corporation Code §18035, it is an unincorporated association. In less technical terms,

5 it is a student club at BHS.

6    77.    WSU currently has approximately 75 members, all of whom are students at BHS.

7    78.    WSU's mission is to advocate to address barriers to success and wellbeing for

8 young women and non-binary students at BHS, including, but not limited to, its members.

9    79.    WSU's mission includes reducing sexual harassment experienced by students of

10 BHS by (1) advocating that the school district adopt policies to protect its members and the

11 student body from sex discrimination, including sexual harassment; and (2) providing training to

12 the student body about sexual consent as well as their rights and responsibilities under school

13 policy, state law, and federal law.

14    80.    Addressing sexual harassment at BHS is a pressing issue for WSU because such

15 harassment negatively affects its members, as well as other women and non-binary students on

16 whose behalf WSU advocates to advance its mission.

17

### BUSD's ongoing refusal to change course on sexual harassment

18    81.    Sexual harassment is not a new issue at BUSD. Over at least the last decade,

19 students and parents have repeatedly asked BUSD to improve its handling of sexual harassment

20 against students. But BUSD has failed to implement meaningful policy changes in response. *See,*

21 *e.g.*, Holly McDede, *How Generations of Berkeley High Students Forced a Reckoning About*

22 *Sexual Abuse*, KQED (Mar. 24, 2021), https://www.kqed.org/news/11864769/how-generations-

23 of-berkeley-high-students-forced-a-reckoning-about-sexual-abuse.

24    82.    BUSD has also been the subject of multiple private lawsuits for money damages

25 concerning BUSD's response to the sexual harassment of students by classmates and staff. *See,*

26 *e.g.*, *"Worst moments of my life." Former Berkeley High student alleges repeated abuse by*

27 *teacher*, San Francisco Chronicle (July 15, 2021),

28

1   https://www.sfchronicle.com/bayarea/article/Worst-moments-of-my-life-Former-Berkeley-

2   16318180.php.

3          83.    The problems are not one-off, but systemic. Between 2014 and 2020, BUSD had

4   at least six different Title IX Coordinators. One of those Title IX Coordinators, a career

5   compliance officer who quit after only six months in the job, was "appalled" by BUSD's lack of

6   support for her office, which she later said was in "shambles" when she joined; BUSD, she says,

7   refused to rectify the problems she raised. *See* Ally Markovich, *She tried to reform Berkeley*

8   *Unified's Title IX office. After six months of frustration, she quit*, Berkeleyside (Sept. 8, 2021),

9   https://www.berkeleyside.org/2021/09/08/she-tried-to-reform-berkeley-unifieds-title-ix-office-

10  after-6-months-of-frustration-she-quit. At one point in 2020, the BHS principal publicly begged

11  the BUSD school board to provide her with the resources necessary to address sexual harassment

12  of students. *See* Natalie Orenstein, *Anger, fear at Berkeley High in wake of sexual assault*

13  *accusations*, Berkeleyside (Feb. 6, 2020), https://www.berkeleyside.org/2020/02/06/anger-fear-

14  at-berkeley-high-in-wake-of-sexual-assault-accusations.

15         84.    These issues came to a head in 2020 when students organized a "walk out," in

16  which much of the student body left class to protest BUSD's failures to address sexual

17  harassment. In the wake of that protest, BUSD committed to changing its ways. Yet, to WSU's

18  knowledge, BUSD has not revised its sexual harassment policies for the better in the 20 months

19  since students protested.

20         85.    To the contrary, since the 2020 Regulations went into effect, BUSD has doubled

21  down on its policies of inaction. Notably, BUSD has publicly represented that it will not

22  investigate reports of sexual harassment that occur off campus, even if that harassment creates a

23  hostile environment on campus. It attributed that restriction to Title IX—presumably a reference

24  to the 2020 Regulations. *See* Megha Krishnan, *Berkeley Unified School District addresses sexual*

25  *harassment concerns,* Daily Californian (Dec. 13, 2020),

26  https://www.dailycal.org/2020/12/13/berkeley-unified-school-district-addresses-sexual-

27  harassment-concerns.

28

*WSU's members and other students have experienced injuries*
*that are no longer cognizable under the 2020 Regulations*

86.     Prior to the 2020 Regulations, WSU and its members could have taken their
experiences of sexual harassment to the Department's Office for Civil Rights in the form of a
Title IX administrative complaint and obtained an investigation and resolution of their claims.
But the 2020 Regulations have rendered the process futile because the unchecked harassment
and deficient school responses that WSU, its members, and other BHS students have experienced
after August 14, 2020 – which WSU and its members have complained or would like to
complain about to the Office for Civil Rights – no longer violate the Department's Title IX
regulations. The Office for Civil Rights is closed for business when it comes to the allegations
WSU has pressed, and those it would like to press, concerning sexual harassment that has
occurred post-August 14, 2020.

87.     *Definitional Change*: Much of the sexual harassment that WSU members and
other BHS students experience does not meet the 2020 Regulations' definition of actionable
harassment.

88.     Before and since the 2020 Regulations went into effect, many WSU members and
other BHS students have been subjected to unwanted sexual comments about their bodies while
in class or walking through the halls of BHS. Often, no single classmate makes more than one
comment to any given student, but the target receives multiple comments from multiple
classmates that, together, create a hostile environment. The 2020 Regulations, however,
redefined sexual harassment by removing schools' obligations to address hostile environments
and now require schools to dismiss – for purposes of Title IX – any investigation into an
individual who is not alleged to have committed harassment that is "severe *and* pervasive." As a
result, BUSD need not investigate hostile environment sexual harassment, and any Title IX
complaint WSU might file about BUSD's failure to do so would not "indicate[] a possible failure
to comply with" the 2020 Regulations, 34 C.F.R. § 100.7(c), and so would not trigger an Office
for Civil Rights investigation and resolution.

89.     On one occasion since the start of the school year, in or around September 2021, "John," a student at BHS, harassed WSU member "Jamie" in their shared class. During class, without invitation, John told Jamie and a small group of other classmates explicit details about his penis, and shared information regarding what he thinks constitutes a "good" penis. Because this conduct was severe but not pervasive – since it only occurred once – the 2020 Regulations do not require BUSD to respond to this harassment and similarly do not permit the Office for Civil Rights to require BUSD to investigate or remediate the harassment or its effects. (Jamie has not reported the incidents to the school because they know BUSD has taken no meaningful action when other students have reported John for more severe sexual harassment. Jamie's lack of faith in BUSD is also informed by their experience telling a teacher about other sexual harassment they experienced their freshman year; the teacher refused to let them change their seat to move away from the harasser, asked no questions about what had occurred, and provided no other assistance.)

90.     *Changed Geographic Limitations*: Much of the sexual harassment that WSU members and other BHS students experience occurs off BUSD property, and outside of any school activity, but creates a hostile environment in school.

91.     For example, during the fall of 2020 and winter of 2021, WSU member "Jane" was sexually harassed outside of school hours and off school grounds by a student with whom she shared a class, John – the same student who has sexually harassed Jamie, who has been reported to BUSD for sexual harassment before, and whose pattern of sexual harassment is well known among the student body. John repeatedly texted Jane, often making unwanted sexual comments about her body, and especially her breasts. In just one night in March 2021, Jane received eight calls, eight direct messages on Instagram, and eight text messages from him. Although John sent his texts from off school grounds and mostly outside school hours, they made Jane uncomfortable sharing a class with him. (Jane did not report the harassment to BUSD because, based on her classmates' experiences reporting harassment to BUSD, she did not believe BUSD would take any action in response.)

92.     Further, WSU member Jamie, a senior at BHS, has been harassed by John on a public bus that both students take to school. (The bus is not run or affiliated with BUSD but it is used by many BHS students to travel to school.) On approximately five separate occasions since the start of the 2021-22 school year, John has sat next to Jamie and made unwanted sexual comments, including sharing explicit details of his sex life and asking Jamie invasive questions about their sexual preferences. John will sometimes touch Jamie's legs and shoulders while making unwanted sexual comments, which makes Jamie uncomfortable, but Jamie is unable to move away from John because they are stuck between John and the bus window. Jamie shares several classes with John, and John's sexual harassment on the bus makes Jamie uncomfortable in those classes. (Jamie has not reported this harassment to BUSD for the same reasons they have not reported John's harassment in class, described in paragraph 89.) Because the harassment took place on a public bus, outside BUSD's program or activity, the 2020 Regulations do not require BUSD to respond to this harassment, even though the harassment creates a hostile environment for Jamie in school, and similarly do not permit the Office for Civil Rights to require BUSD to investigate or remediate the harassment or its effects.

93.     As explained above, as a matter of announced policy, BUSD will not investigate reports of sexual harassment that occur off campus, even if that harassment creates a hostile environment on campus, and appears to attribute that decision to the 2020 Regulations. On information and belief, BUSD has acted in accordance with this policy in addressing other instances of sexual harassment post-August 14, 2020.

94.     BUSD was required to respond to this kind of harassment under OCR's previous interpretation of Title IX. But because of the 2020 Regulations, BUSD need not address off-campus sexual harassment that occurs outside a school activity and which creates a hostile environment at BHS. As a result, any Title IX complaint WSU might file about BUSD's failure to do so would not "indicate[] a possible failure to comply with" the 2020 Regulations, 34 C.F.R. § 100.7(c), and so would not trigger an Office for Civil Rights investigation and resolution.

95.     Indeed, as applied, the Office for Civil Rights has dismissed complaints when the alleged sexual assault did not occur within the school's education program or activity—exactly

as the 2020 Regulations require. *See* Letter of Dismissal from Office for Civil Rights regarding Dickinson College, No. 03-21-2082, at 1 (Feb. 24, 2021) ("The incident you reported did not occur within the College's education program or activity. As such, the College did not have an obligation to provide a response to you that complies with the requirements of Title IX.").

96.    *Changes to the Knowledge Standard*: Much of the sexual harassment that WSU members and other BHS students experience is not reported to BUSD officials, but is harassment that BUSD should know about. That is, it is harassment of which BUSD has constructive but not actual knowledge.

97.    Every day, BHS students, including WSU members, are subjected to unwanted, sexualized comments in school hallways and classrooms. Under the Office for Civil Rights' previous constructive knowledge standard, that would have been sufficient to impute knowledge of the harassment to BUSD. *See* 2001 Revised Sexual Harassment Guidance at 13-14. Now, in order to successfully seek relief from the Office for Civil Rights, a complainant must provide the name of a specific teacher or other staff member that witnessed (or was told about) the harassment before the Office will open an investigation. *See* paragraph 110 below.

98.    During remote learning, a student is required to spend unsupervised time alone with another student in a Zoom "breakout room," digital spaces in which students converse on video without a teacher present. WSU cannot allege that any teacher had actual knowledge of sexual harassment between particular students in these Zoom breakout rooms. But WSU member Jane understood from a teacher that a supermajority of the girls in one of the classes she shared with John during the 2020-2021 academic year requested not to share a Zoom breakout room with him. The requests by numerous girls not to be paired with a single boy would have been enough prior to the 2020 Regulations to find that the school should have aware of possible sexual harassment and taken steps to inquire. But because WSU does not have reason to believe the teacher was expressly told by those other girls that their requests regarding John were based on sexual harassment, WSU cannot allege that the teacher had actual knowledge that John had harassed those other girls and so cannot, under the 2020 Regulations, ask the Office for Civil Rights to provide relief for BUSD's failure to discover and remediate these instances.

99.     And although WSU members have told multiple BHS teachers whom they trust about the general problem of sexual harassment and breakout rooms, including in a conversation in Spring 2021, the students did not share specifics, such as the identities of the students involved or the particular classes in which the problem has arisen. The teachers expressed concern and empathy, and noted they lacked guidance from BHS about how to deal with the specific challenges of supervising breakout rooms. WSU does not have reason to believe any teacher was on actual notice about a particular incident involving particular students in a particular class.

100.    Prior to the 2020 Regulations for sexual harassment, and still true today for race- and disability-based harassment, "[a] finding that a recipient had constructive notice of a hostile environment meets the notice requirement of the analysis." 1994 Racial Harassment Guidance. BUSD has constructive knowledge of a general sexually hostile environment at BHS based, among other things, on the severity and pervasiveness of the harassment; years of student protests; a student-run Instagram account that, during the summer and fall of 2020, posted stories about sexual harassment BUSD students experienced at school; and meetings WSU leadership had with school administrators in the fall of 2020, in which the leaders expressed their concerns about sexual harassment at the school.

101.    Now, however, because of the 2020 Regulations, BUSD may only violate Title IX if it has *actual* knowledge of sexual harassment. That is, school staff must have received a report of the sexual harassment or witnessed it. 34 C.F.R. § 106.30(a). Accordingly, any Title IX complaint WSU might file about BUSD's response to sexual harassment of which it has constructive but not actual knowledge would not "indicate[] a possible failure to comply with" the 2020 Regulations, *id*. § 100.7(c), and so would not trigger an Office for Civil Rights investigation and resolution.

102.    Indeed, as applied, the Office for Civil Rights requires a student to file a formal complaint before a school must make any response to sexual harassment. For example, on February 23, 2021, the Office for Civil Rights dismissed a complaint where a student alleged that its school had failed to respond to sexual orientation harassment, which the Office treats as a form of sexual harassment. The Office for Civil Rights dismissed the allegation that the

1    University failed to adequately respond to a report of sexual harassment based on the lack of a

2    formal complaint by a student. "[Y]ou stated that you had not filed a complaint with the

3    University about [the student]. Under the current Title IX regulations, the University is only

4    required to respond [to a report about sexual harassment] when a complainant files, or a Title IX

5    Coordinator signs, a formal complaint. Therefore, OCR is dismissing Allegation 4." Letter of

6    Dismissal from Office for Civil Rights regarding University of Maryland-Baltimore County, No.

7    03-21-2054, at 2 (Feb. 23, 2021).

8            103.    *Changes to the Liability Standard*:  In order to obtain any relief, WSU members

9    must not only show that BUSD responded unreasonably, but clearly unreasonably. By increasing

10   the deference that BUSD receives, the 2020 Regulations have reduced the likelihood that WSU

11   members will obtain any relief. BUSD responds to much of the sexual harassment that WSU

12   members and other BHS students experience in a manner that is unreasonable but not *clearly*

13   unreasonable. Accordingly, any Title IX complaint WSU might file about BUSD's unreasonable,

14   but not clearly unreasonable, response to sexual harassment would not "indicate[] a possible

15   failure to comply with" the 2020 Regulations, 34 C.F.R. § 100.7(c), and so would not trigger an

16   Office for Civil Rights investigation and resolution.

17   ***The 2020 Regulations have impaired WSU's procedural right to obtain an investigation and***

18   ***resolution of its administrative Title IX complaint against BUSD***

19           104.    On February 26, 2021, hoping that the 2020 Regulations would not survive the

20   multiple lawsuits then pending against the Department, WSU filed an administrative complaint

21   with the Office for Civil Rights pursuant to 34 C.F.R. § 100.7 describing BUSD's patterns and

22   practices of addressing sexual harassment. In its administrative complaint and during the course

23   of the evaluation process, WSU provided the Office for Civil Rights with the examples in

24   paragraphs 91 and 97-99 above as specific illustrations. Those alleged violations of Title IX that,

25   under the 2020 Regulations, are no longer cognizable.

26           105.    Absent the 2020 Regulations, WSU would file a further complaint with the Office

27   for Civil Rights concerning the ongoing unchecked harassment, including the examples in

28

1    paragraphs 89 and 92 above. But these incidents are also no longer cognizable because of the

2    2020 Regulations.

3          106.    But for the Department's 2020 Regulations, WSU's complaints concerning post-

4    August 14, 2020 sexual harassment would be opened for investigation by the Office for Civil

5    Rights. Without a doubt, the Office for Civil Rights cannot investigate and find BUSD in

6    violation of Title IX for how it handled the post-August 14, 2020 sexual harassment that WSU

7    has already included in the February 2021 administrative complaint (or in response to requests

8    for additional information to support the complaint). The simple truth is that the 2020

9    Regulations no longer make it unlawful for purposes of administrative enforcement for BUSD to

10   disregard sexual harassment that is severe but not pervasive (or pervasive but not severe); sexual

11   harassment that originates outside the school's "program or activity," even though it impacts

12   students' ability to participate in the school's program or activity; and sexual harassment that the

13   school should reasonably know about, but of which it lacks actual knowledge. Even for

14   cognizable sexual harassment that the school knows about, the 2020 Regulations do not require

15   complete relief and, in fact, allow the school to respond unreasonably to the harassment, so long

16   as its response is not clearly unreasonable.

17   *             The Department's Office for Civil Rights has not yet, and will not,*

18   *                 open WSU's complaint for investigation*

19         107.    Actions by the Office for Civil Rights in the 220 days since the administrative

20   complaint was filed on February 26, 2021, offer further support that it will not be opening

21   WSU's complaint for investigation.

22         108.    On March 2, 2021, the Office for Civil Rights sent WSU an acknowledgement

23   letter stating that it was "evaluating your complaint to determine whether OCR will accept your

24   allegation(s) for investigation" and that its "target date for completion of this process is 30 days

25   from the date of this letter."

26         109.    On March 12, 2021, the Office for Civil Rights sent eleven questions (some with

27   up to seven sub-questions), to which WSU responded on April 9. On April 12, the Office for

Civil Rights sent WSU 4 more questions (all with 2 or 3 sub-questions) about WSU's responses to the first round of questions. WSU responded on April 22.

110.   On May 11, the Office for Civil Rights sent WSU an email with eight additional questions about WSU's responses to the second round of questions. WSU responded on May 21. In response to WSU's inquiry about the need for some of the information in deciding whether to open the complaint for investigation (such as the names of the teachers WSU members spoke with), the Office for Civil Rights stated on May 21 that "[t]he requests for additional information from you have been to avoid a potential dismissal" on the basis that the complaint "lacks sufficient factual detail" under § 108(b) of the *Complaint Processing Manual*. WSU participated in a phone call with the Office for Civil Rights on June 1, 2021, where it was informed that the teachers would not be contacted unless an investigation was open but that the Office for Civil Rights nonetheless wanted to information at this stage.

111.   On June 4, the Office for Civil Rights memorialized its June 1 phone request for WSU to answer some additional questions and also asked to speak with three students whom WSU had identified by pseudonym as experiencing certain incidents of harassment. In WSU's June 25 response, WSU answered the questions (including providing the names of the teachers WSU members spoke with), stated that it would prefer to continue to respond in writing, but noted that if the Office for Civil Rights will not open an investigation into some or all of WSU's complaint on the basis that the students did not participate in a pre-investigation interview, the Office for Civil Rights should let WSU know.

112.   On June 28, the Office for Civil Rights informed WSU that in order for it "to pursue further evaluation," it needed the written consent of the parents of the three students pseudonymously identified by WSU in its April 9 response. On July 1, WSU responded that it was confused why consent for those three students was needed when WSU had already filed a consent form and the complaint was filed on behalf of itself and a class of people protected by Title IX. The same day, the Office for Civil Rights said no consent forms were needed because WSU had clarified that the complaint was not on behalf of the three students. On July 6, WSU responded that its complaint was not on behalf of the three specific students, but these students

1   are likely part of the class of students on whose behalf WSU filed the complaint. The Office for

2   Civil Rights responded that same day that it understood and thanked WSU for the clarification.

3         113.    WSU has not heard anything from the Office for Civil Rights since July 6.

4         114.    According to its most recent Annual Report, available at

5   https://www2.ed.gov/about/reports/annual/ocr/report-to-president-and-secretary-of-education-

6   2020.pdf, the Office for Civil Rights aims to resolve all complaints within 180 days of receipt

7   and in fact resolved 90% of complaints within 180 days of receipt. The Office for Civil Rights'

8   initial letter to WSU stated that the target date for completing the evaluation for whether to open

9   WSU's complaint for investigation was April 1 (30 days after the letter was sent). The fact that it

10  has not even opened WSU's complaint for investigation after 220 days, much less resolved it,

11  and has not been in touch with WSU for 90 days since its last set of questions was answered,

12  confirms what the 2020 Regulations make plain: the Office for Civil Rights will not be opening

13  an investigation into WSU's claims concerning post-August 14, 2020, sexual harassment.

14                ***WSU's procedural injury results in harm to its members and other students***

15        115.    For the reasons described above, the 2020 Regulations deny WSU and its

16  members the right they had prior to the 2020 Regulations to have their administrative complaints

17  investigated.

18        116.    The denial of that procedural right impinges on the concrete interest of WSU and

19  its members to participate in and benefit from BUSD's education program because the denial

20  allows the hostile environment at BUSD to continue unremediated.

21        117.    The denial of that procedural right impinges on the concrete interests of WSU

22  members who have been sexually harassed because they cannot receive remedies from the Office

23  for Civil Rights to address their educational deprivations.

24        118.    The denial of that procedural rights impinges on the concrete interests of WSU

25  members, regardless of whether they have previously been sexually harassed, who are at greater

26  risk of future sexual harassment because the Office for Civil Rights will not investigate and press

27  BUSD to adopt policy changes to end the hostile environment at BUSD.

28

119.    The denial of that procedural right impinges on the concrete interests of WSU members, including those who are not directly targeted by sexual harassment. For example, some WSU members and other BHS students have had to share classrooms or hallways with students who have sexually assaulted their friends. That makes these students feel unsafe and uncomfortable. One WSU member, "Sarah," had a panic attack at school this academic year when she saw a classmate who had sexually assaulted one of her friends with impunity; she has started walking to class a different way to avoid seeing him. As one student explained to a journalist, "I was always seeing somebody who had done something or experienced something or a hallway where something had been done. It's always on your mind and it's always breaking your heart." Similarly, because sexual harassment is so prevalent at BHS, WSU members and other BHS students sometimes feel uncomfortable when assigned to work on group projects with young men they do not know and trust.

### *Additional injuries to WSU's members caused by the 2020 Regulations*

120.    Apart from the procedural injuries identified above, WSU's members are injured by the cumulative effect of each of the challenged 2020 Regulations, which will lead to students experiencing more sexual harassment and receiving fewer remedies.

121.    The 2020 Regulations vastly change the incentives of schools to prioritize preventing and deterring sexual harassment. Under the challenged provisions, a school's failure to effectively prevent and promptly respond to sexual harassment will be much less likely to carry any consequences. In fact, a school may be incentivized to avoid learning about the harassment its students experience, in order to avoid triggering any obligations under the Regulations.

122.    The 2020 Regulations also discourage students from filing complaints with their schools in the first place by creating uncertainty about what conduct will trigger a school's obligation under Title IX to investigate and respond to sexual harassment.

123.    The Department itself acknowledged that the 2020 Regulations would reduce investigations of sexual harassment by 50% in K-12 schools. But nowhere does the Department

1  conclude that a substantial reduction in investigations will result in less sexual harassment or

2  more "effective" protections against sexual harassment. Nor could it.

3        124.    To the contrary, the 2020 Regulations will result in more students being subjected

4  to sexual harassment because it narrows the scope of Title IX's protections.

5        125.    The Department itself, in the preamble to the 2020 Regulations, recognized that

6  "weak sanctions against sexual violence perpetrators and weak laws and policies related to

7  sexual violence and sex equality are associated with a greater likelihood of perpetration." 85 Fed.

8  Reg. at 30,070.

9        126.    Because fewer incidents of sexual harassment will be investigated under the 2020

10 Regulations, the likelihood of this harassment being detected and addressed will also be reduced.

11 These decreases will have an appreciable impact on a school's ability to deter future and

12 repeated sexually harassing conduct and on students' ability to attend a school free from hostile

13 environments. As noted above in paragraph 119, the injury caused by sexual harassment is not

14 limited to the direct targets of the harassment; WSU members have had to share classrooms with

15 students who have sexually assaulted their friends, leaving the students feeling unsafe and

16 uncomfortable.

17       127.    In addition, even if the Office for Civil Rights were to open some or all of the

18 allegations of WSU's complaint for investigation, the Department's 2020 Regulations do not

19 require and, in fact, discourage BUSD from taking actions that were previously required under

20 the Department's prior interpretations of Title IX and that WSU wishes BHS to take. The 2020

21 Regulations themselves thus deprive WSU of a critical bargaining tool as it seeks to achieve

22 these changes at BHS as part of WSU's organizational purpose.

### CLAIM

*Violations of Administrative Procedure Act, 5 U.S.C. § 706(2)(A) & (C)*

1.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as
      though fully set forth here.

*Plaintiff's First Amended Complaint for Injunctive and Declaratory Relief* – 30

2.     The 2020 Regulations are not in accordance with law and short of statutory right because the Department adopted provisions that are contrary to the text and purpose of Title IX.

3.     The 2020 Regulations are arbitrary and capricious because the Department changed its longstanding prior interpretations without sufficient justification for the change and, in some instances, without displaying awareness that it was changing its view.

4.     The 2020 Regulations are arbitrary and capricious because the Department failed to consider important aspects of the problem, including that the Regulations discourage students from filing complaints about sexual harassment with their schools and discourage schools from learning about sexual harassment experienced by their students.

5.     The 2020 Regulations are arbitrary and capricious because, contrary to the evidence and in conflict with its own rationale about the effect of the regulations on school and student behavior, the Department refused to find that the provisions would increase the amount of sexual harassment that students would experience. The Department thus disregarded a factor that Title IX itself made highly relevant and failed to consider an important aspect of the problem.

6.     The 2020 Regulations are arbitrary and capricious because, without a satisfactory explanation, the Department imposed special limitations, procedures, and obstacles for sexual harassment claims that do not apply to any other sex discrimination claims under Title IX or to race- and disability-based discrimination (including harassment) claims under Title VI, the Rehabilitation Act, and the Americans with Disabilities Act.

7.     The 2020 Regulations are arbitrary and capricious because the Department failed to consider important aspects of the problem, including the disparate effect that the Regulations will have on women and girls and LGBTQ students.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.   Declare that Defendant's 2020 Regulations challenged in this Complaint, and any provisions that cannot be severed from the challenged provisions, are unlawful.

B.   Enter a preliminary and permanent injunction holding unlawful and setting aside the Regulations challenged in this Complaint, and any challenged provisions that cannot be severed from those provisions, as arbitrary or capricious; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or otherwise not in accordance with law.

C.   Award Plaintiff its reasonable costs and attorneys' fees incurred in the prosecution of this action; and

D.   Award such other equitable and further relief as the Court deems just and proper.

Date: October 4, 2021                                    Respectfully submitted,

Seth M. Galanter*                                    Adele P. Kimmel (CA Bar No. 126843)
National Center for Youth Law                  Alexandra Z. Brodsky*
712 H Street NE, Suite 32020                    Public Justice
Washington, DC 20002                             1620 L Street NW, Suite 630
Ph: (202) 868-4781                                   Washington, DC 20036
Fax: (510) 835-8099                                   Ph: (202) 797-8600
Email: sgalanter@youthlaw.org                Fax: (202) 232-7203
                                                                 Email: akimmel@publicjustice.net
                                                                             abrodsky@publicjustice.net


  /s/ Lauren A. Khouri
Linda M. Correia*                                    John He (CA Bar No. 328382)
Lauren A. Khouri*                                    Public Justice
Correia & Puth, PLLC                               475 14th Street, Suite 610
1400 16th Street NW, Suite 450                 Oakland, CA 94612
Washington DC 20036                              Ph: (510) 622-8150
Ph: (202) 602-6500                                   Fax: (202) 232-7203
Fax: (202) 602-6501                                  Email: jhe@publicjustice.net
Email: lcorreia@correiaputh.com
            lkhouri@correiaputh.com             * admitted pro hac vice