**OFFICE OF THE ATTORNEY GENERAL OF TEXAS**
PATRICK K. SWEETEN,
   E-Mail: Patrick.Sweeten@oag.texas.gov
KATHLEEN T. HUNKER
   E-Mail: Kathleen.Hunker@oag.texas.gov
P.O. Box 12548 (MC-009)
Austin, TX 78711-2548
Telephone: 512.936.1414
Facsimile: 512.936.0545

**LEWIS BRISBOIS BISGAARD & SMITH** LLP
MICHAEL K. JOHNSON, CA Bar No. 130193
   E-Mail: Michael.Johnson@lewisbrisbois.com
2185 North California Boulevard, Suite 300
Walnut Creek, California 94596
Telephone: 925.357.3456
Facsimile: 925.478.3260
Attorneys for [Proposed] Intervenor-Defendant
KEN PAXTON IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF TEXAS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| THE WOMEN'S STUDENT UNION, | Case No. 3:21-cv-01626-EMC |
| Plaintiff, | |
| vs. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TEXAS' MOTION TO INTERVENE** |
| U.S. DEPARTMENT OF EDUCATION, | |
| Defendant. | |
| STATE OF TEXAS, | **Hearing Date:** **December 16, 2021** <br> **Time:** **1:30 p.m.** <br> **Ctrm::** **5, 17th Floor** |
| [Proposed] Intervenor-Defendant. | Judge:    Hon. Edward M. Chen |

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1

## MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE

2    The State of Texas ("Texas") respectfully moves to intervene in defense of the Department

3    of Education's ("the Department") Final Rule addressing Title IX obligations, which took effect on

4    August 14, 2020.[1] Texas submits this motion because, as a common provider of education, Texas

5    has a compelling interest in the Department issuing clear, practical regulatory guidance, which

6    enables the State to combat sexual harassment without risking excessive liability and without

7    sacrificing its commitment to free speech and fair process or its receipt of federal funds. The Biden

8    Administration, however, has expressed open hostility to the provisions in the Final Rule that do

9    just that. It has ordered the Department to start the process for the Final Rule's repeal, and it has

10   refused to appeal an adverse judgment, which vacated part of the Final Rule.[2] These actions

11   demonstrate that the Department will not provide a robust defense of the Final Rule or adequately

12   represent Texas's significant protectable interests.

13

14

15

16

17

18

19

20

21

22

23

24

25



26   [1] *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020).

27   [2] As a result of the Department's refusal to defend the entirety of the Final Rule, the United States

28   District Court for the District of Massachusetts permitted Texas to intervene in *Victim Rights Law Center (VRLC) v. Cardona*, ECF 195, No. 1:20-cv-11104-WGY (D. Mass Sept. 27, 2020).



LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

# TABLE OF CONTENTS

**Page**

BACKGROUND ..................................................................................................................3

I.   The Final Rule Creates The First Clear And Binding Standards Regarding Sexual
     Harassment. ...........................................................................................................3

II.  The Biden Administration Sets Out To Repeal Or Otherwise Eliminate The Final
     Rule Immediately After Taking Office. ..................................................................5

LEGAL STANDARD............................................................................................................8

ARGUMENT ......................................................................................................................9

I.   The Court Should Grant Intervention As Of Right. ...............................................9

     A.   Texas's motion is timely. ............................................................................9

     B.   As a provider of public education, Texas has a concrete, protectable interest
          in defending the challenged provisions of the Final Rule. ........................10

     C.   The disposition of this action will substantially impair or impede Texas's
          interests......................................................................................................13

     D.   None of the parties adequately represent Texas's interests.......................15

II.  In The Alternative, The Court Should Permit Permissive Intervention. ..............17



LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7765-5807.1                                     i                        Case No. 3:21-cv-01626-EMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Alpha Inv., LLC v. Zynga, Inc.*,
No. C 11-03500 JSW, 2012 WL 832447 (N.D. Cal. Mar. 12, 2012)........................................ 9

*Arakaki v. Cayetano*,
324 F.3d 1078 (9th Cir. 2003) ........................................................................................ 15

*Bates v. Jones*,
904 F. Supp. 1080 (N.D. Cal. 1995) ............................................................................... 15

*Bresgal v. Brock*,
637 F. Supp. 271 (D. Or. 1985), *aff'd as modified*, 843 F.2d 1163 (9th Cir.
1987) ............................................................................................................................. 9

*Builders Ass'n of Greater Chicago v. City of Chicago*,
170 F.R.D. 435 (N.D. Ill. 1996) ..................................................................................... 11

*California v. Health & Human Servs.*,
330 F.R.D. 248 (N.D. Cal. 2019) ..................................................................... 8, 13, 17, 18

*Citizens for Balanced Use v. Montana Wilderness Ass'n*,
647 F.3d 893 (9th Cir. 2011) ..................................................................................... 14, 15

*City & Cnty. of San Francisco v. U.S. Citizenship & Immig. Servs.*,
992 F.3d 742 (9th Cir. 2021) (VanDyke, J., dissenting) ............................................. 14, 16

*Commonwealth of Pennsylvania v. Cardona*,
No. 1:20-cv-01468-CJN (D.D.C. Feb. 4, 2021) .................................................................. 8

*Daggett v. Comm'n on Gov't Ethics*,
172 F.3d 104 (1st Cir. 1999) (Lynch, J., concurring) ........................................................... 9

*Daniel v. Univ. of Tex. Sw. Med. Ctr.*,
960 F.3d 253 (5th Cir. 2020) ......................................................................................... 11

*DeJohn v. Temple Univ.*,
537 F.3d 301 (3d Cir. 2008) ............................................................................................. 5

*Doe v. Univ. of Scis.*,
961 F.3d 203 (3d Cir. 2020) ........................................................................................... 12

*E.E.O.C. v. Nat'l Children's Ctr., Inc.*,
146 F.3d 1042 (D.C. Cir. 1998) ...................................................................................... 18

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

*Edwards v. City of Houston,*
    78 F.3d 983 (5th Cir. 1996) ............................................................................................. 8

*Freedom from Religion Found., Inc. v. Geithner,*
    644 F.3d 836 (9th Cir. 2011) ......................................................................................... 17

*Humane Soc. of U.S. v. Clark,*
    109 F.R.D. 518 (D.D.C. 1985) ...................................................................................... 18

*Int'l Fur Trade Fed'n v. City & Cnty. of San Francisco,*
    20-CV-00242-RS, 2020 WL 6931066 (N.D. Cal. Apr. 17, 2020) .......................... 15

*Int'l Paper Co. v. Inhabitants of Town of Jay,*
    887 F.2d 338 (1st Cir. 1989) .......................................................................................... 17

*Kamakahi v. Am. Soc'y for Reprod. Med.,*
    11-CV-01781-JCS, 2015 WL 1926312 (N.D. Cal. Apr. 27, 2015) ........................ 10

*Kukui Gardens Corp. v. Holco Capital Grp., Inc.,*
    261 F.R.D. 523 (D. Haw. 2009) ...................................................................................... 8

*Davis ex rel. LaShonda D. v. Monroe County Board of Education,*
    526 U.S. 629 (1999) ........................................................................................................... 5

*League of United Latin Am. Citizens v. Wilson,*
    131 F.3d 1297 (9th Cir. 1997) ......................................................................................... 8

*California ex rel. Lockyer v. United States,*
    450 F.3d 436 (9th Cir. 2006) ......................................................................................... 14

*Nat. Res. Def. Council v. Norton,*
    1:05CV01207 OWW TAG, 2006 WL 39094 (E.D. Cal. Jan. 5, 2006) .................. 14

*New York v. United States Dep't of Educ,*
    20-CV-4260 (JGK), 2020 WL 3962110 (S.D.N.Y. July 10, 2020) ........................ 17

*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland,*
    960 F.3d 603 (9th Cir. 2020) ......................................................................................... 17

*Or. Env't Council v. Or. Dep't of Env't Quality,*
    775 F. Supp. 353 (D. Or. 1991) .................................................................................... 18

*Perry v. Proposition 8 Official Proponents,*
    587 F.3d 947 (9th Cir. 2009) ......................................................................................... 15

*Prete v. Bradbury,*
    438 F.3d 949 (9th Cir. 2006) ........................................................................................... 8

*Raytek, Inc. v. Omega Eng'g, Inc.,*
    C-93-20188 RMW PVT, 1993 WL 404088 (N.D. Cal. Sept. 22, 1993) ................ 9

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7765-5807.1
iii
Case No. 3:21-cv-01626-EMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

*Retiree Support Group of Contra Costa Cnty. v. Contra Costa Cnty.*,
   315 F.R.D. 318 (N.D. Cal. 2016) ................................................................................ 9

*S.E.C. v. Navin*,
   166 F.R.D. 435 (N.D. Cal. 1995) .............................................................................. 13

*S.E.C. v. Private Equity Mgmt. Group, Inc.*,
   CV 09-2901 PSG (EX), 2009 WL 2488044 (C.D. Cal. Aug. 10, 2009) ...................... 14

*San Francisco NAACP v. San Francisco Unified Sch. Dist.*,
   59 F. Supp. 2d 1021 (N.D. Cal. 1999) ...................................................................... 14

*Scholl v. Mnuchin*,
   483 F. Supp. 3d 822 (N.D. Cal. 2020) ...................................................................... 18

*Smith v. Los Angeles Unified Sch. Dist.*,
   830 F.3d 843 (9th Cir. 2016) .................................................................................... 10

*Sw. Ctr. for Biological Diversity v. Berg*,
   268 F.3d 810 (9th Cir. 2001) ............................................................................. 13, 14

*Syngenta Seeds, Inc. v. Cnty. of Kauai*,
   CIV. 14-00014BMK, 2014 WL 1631830 (D. Haw. Apr. 23, 2014) .......................... 14

*Trbovich v. United Mine Workers of Am.*,
   404 U.S. 528 (1972) .................................................................................................. 15

*United States v. Alisal Water Corp.*,
   370 F.3d 915 (9th Cir. 2004) ...................................................................................... 8

*United States v. Blue Lake Power, LLC*,
   215 F. Supp. 3d 838 (N.D. Cal. 2016) ........................................................................ 9

*United States v. City of Los Angeles*,
   288 F.3d 391 (9th Cir. 2002) .................................................................................... 17

*Venegas v. Skaggs*,
   867 F.2d 527 (9th Cir. 1989), *aff'd sub nom. Venegas v. Mitchell*, 495 U.S. 82
   (1990) .................................................................................................................. 18, 19

*Victim Rights Law Center v Cardona*,
   No. 3:21-cv-01626-EMC (D. Mass Jun. 10, 2020) ....................................... 7, 16, 17

*VRLC v. Cardona*,
   No. 1:20-cv-11104-WGY (D. Mass Sept. 27, 2021) .................................................... 8

**Federal Statutes**

20 U.S.C.
   § 1681 *et seq.* ............................................................................................................ 3

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7765-5807.1             iv             Case No. 3:21-cv-01626-EMC

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

Administrative Procedures Act ................................................................................. 16, 18

**Other Authorities**

Executive Order 14021, 86 Fed. Reg. 13,803 (Mar. 11, 2021) ....................................... 6

Fed. R. Civ. P. 24(b)(1)(B)............................................................................................ 18

Rule 24(a) .............................................................................................. 8, 13, 15

Rule 24(b) .............................................................................................. 8, 13, 17

Tex. Const. Article VII, § 1 ...................................................................................... 10



**BACKGROUND**

**I.      The Final Rule Creates The First Clear And Binding Standards Regarding Sexual Harassment.**

Everyone agrees that academic institutions should take a hard stance against sexual harassment in education, including by enforcing Title IX, as enacted by Congress. 20 U.S.C. § 1681 *et seq.* That commitment, however, should not come at the expense of other students' rights. Nor should it force recipients to assume responsibilities that are not prescribed by statute. Prior to May 2020, the Department of Education had never issued comprehensive regulations that treated sexual harassment, including sexual assault, as unlawful sex discrimination. The Department instead relied on a series of guidance documents that not only imposed duties on recipients that exceeded the text of Title IX, but often raised more questions than they answered, creating much confusion.[3] In addition, the guidance documents bullied recipients into a false choice: either combat sexual harassment or protect the right of accused students to free speech and a fair hearing. Regardless of which option recipients picked, the decision left recipients open to a high risk of litigation and liability.[4]

Of the guidance documents issued by the Department, the two that had the greatest impact were the 2011 "Dear Colleague" Letter[5] and the 2014 Questions and Answers.[6] Though neither document went through notice-and-comment rulemaking, the two guidance documents adopted an

---

[3] The Task Force on Federal Regulation of Higher Education specifically identified the 2011 Dear Colleague Letter and 2014 Question and Answers as guidance documents that were meant to eliminate uncertainty but only led to more confusion. *See Recalibrating Regulation of Colleges and Universities* at 14 (Feb. 12, 2015), *available at* https://www.acenet.edu/Documents/Higher-Education-Regulations-Task-Force-Report.pdf.

[4] *See* Greta Anderson, *More Title IX Lawsuits by Accusers and Accused*, INSIDER HIGHER ED (Oct. 3, 2019), https://www.insidehighered.com/news/2019/10/03/students-look-federal-courts-challenge-title-ix-proceedings (describing "addressing sexual misconduct" as a "lose-lose situation for universities").

[5] Russlynn Ali, OCR, U.S. Dep't of Educ., Dear Colleague Letter: Sexual Violence (Apr. 4, 2011), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

[6] U.S. Dept. of Educ., *Questions and Answers on Title IX and Sexual Violence* (Apr. 24, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

(footnote continued)

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

expansive definition of sexual harassment that included all "unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature"—no matter how trivial. 2011 Dear Colleague Letter, *supra* n. 2, at 3. The documents also stipulated that "[e]ven if a school was not on notice, the school is nonetheless responsible for remedying any effects of the sexual harassment on the student, as well as for ending the sexual harassment and preventing its recurrence." 2014 FAQs, *supra* n. 3, at A-6. Failure to meet these standards incurred the risk of a public enforcement action, a private lawsuit, and even the loss of federal funds, which can be devastating even to relatively large educational institutions.[7]

The 2011 Dear Colleague Letter and 2014 Questions and Answers had a detrimental impact on publicly-funded education across the country, including in Texas. The heightened responsibility, combined with the deemphasis on individual rights, pressured many schools to hyperregulate controversial speech as well as eliminate procedures that helped guarantee fair process to students accused of harassment. Thus, in response to growing criticism, the Department, under the Trump Administration, rescinded both the 2011 Dear Colleague Letter and the 2014 Questions and Answers in 2017.[8] It soon became apparent, however, that the withdrawal could not repair the damage caused by the two guidance documents on its own; nor could the interim guidelines the Department issued while it solicited input from stakeholders.[9] The Department therefore issued on May 19, 2020 the Final Rule that is the subject of this action.

In doing so, the Department addressed at least three significant defects in the earlier guidance: *First*, the Final Rule clearly demarcated, for the first time, the outer boundaries of recipients' obligations under Title IX with respect to sexual harassment. *Second*, the Final Rule

---

[7] *See Two Decades of Change in Federal and State Higher Education Funding: Recent trends across levels of government*, PEW (Oct. 15, 2019), https://www.pewtrusts.org/en/research-and-analysis/issue-briefs/2019/10/two-decades-of-change-in-federal-and-state-higher-education-funding (discussing the significance of federal funds).

[8] *See* Candice Jackson, OCR, U.S. Dept. of Educ., Dear Colleague Letter (Sept. 9, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

[9] U.S. Dept. of Educ., *Q&A on Campus Sexual Misconduct (*Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

clarified the standard under which recipients may be found noncompliant—namely, the recipients must have actual knowledge and be deliberately indifferent to the alleged harassment. *Third*, the Final Rule rejected the misapprehension created by the Department's earlier guidance that Title IX requires recipients to restrict students' rights to free speech and a fair hearing to avoid a finding of noncompliance. On the contrary, the Final Rule set forth reasonable standards, required of all recipients, that balance the interests at stake and ensure that recipients comply with their constitutional obligations, as articulated by courts across the country. This included adopting the standard set forth in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629, 651 (1999), which limits the definition of sexual harassment to conduct that is severe, pervasive, and objectively offensive. *See DeJohn v. Temple Univ.*, 537 F.3d 301, 318 (3d Cir. 2008) (observing that the *Davis* standard protects core protected speech).

## II.     The Biden Administration Sets Out To Repeal Or Otherwise Eliminate The Final Rule Immediately After Taking Office.

Plaintiff Women's Student Union ("Plaintiff") dislikes the reforms promulgated by the Final Rule. It therefore has initiated suit against the Department, contending that four provisions violate the Administrative Procedure Act ("APA"). However, in the time between the Department issuing the Final Rule and Plaintiff filing its complaint, the Department came under the direction of a new presidential administration committed to reviving the failed policies of old. Then-Vice-President Joe Biden played a key role in the development and implementation of the Obama Administration's policies on sexual harassment, including the changes the administration advanced regarding Title IX. He co-chaired the White House Task Force to Protect Students from Sexual Assault, and he even stood as the Obama Administration's spokesperson for the 2011 Dear Colleague Letter, announcing its publication to students at the University of New Hampshire in Durham.[10]

The former Vice President's opinions regarding Title IX policy have not changed in the

---

[10] *See* Press Release, U.S. Dept. of Educ., *Vice President Biden Announces New Administration Effort to Help Nation's Schools Address Sexual Violence* (Apr. 4, 2011), https://www.ed.gov/news/press-releases/vice-president-biden-announces-new-administration-effort-help-nations-schools-ad.


LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7765-5807.1                                        5                          Case No. 3:21-cv-01626-EMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

interim. From the moment it was announced, the former Vice President opposed the Department's new regulations. He repeatedly (and erroneously) characterized the Final Rule as "a green light to ignore sexual violence." *The Biden Agenda for Women*, JOEBIDEN.COM, https://joebiden.com/womens-agenda/ (last visited Oct. 4, 2021). And he assured his supporters on the campaign trail that he intended to advance the same objectives for Title IX as he did during the Obama Administration should he be elected to the presidency. According to his website, a Biden Administration would restore the 2011 Dear Colleague Letter and curtail, if not repeal outright, reforms contained in the Final Rule. *See The Biden Plan to End Violence Against Women*, JOEBIDEN.COM, https://joebiden.com/vawa/ (last visited Oct. 4, 2021). Indeed, a common refrain of his campaign was that the Department under a Biden Administration would put a "quick end" to the Final Rule. *The Biden Agenda for Women*, JOEBIDEN.COM.

Following the election, now-President Biden has sought to make good on his promise. On March 8, 2021, President Biden issued an Executive Order that directed the Secretary of Education to review the Final Rule for "consistency" with the Biden Administration's stated Title IX policy. Executive Order 14021, 86 Fed. Reg. 13,803 (Mar. 11, 2021). The Order instructed the Secretary to "consider suspending, revising or rescinding" any portion of the Final Rule he deems inconsistent with that policy. *Id.* at 13,803. In response, the Department issued a letter to students, educators, and stakeholders on April 6, 2021, stating that the Department anticipates publishing a notice of proposed rulemaking once it has finished its review of the Final Rule.[11] The Department has since posted on a U.S. General Services Administration website that it expects to publish the revised rule in May 2022. *RIN: 1870-AA16*, Reginfo.gov (Spring 2021), https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1870-AA16 (last visited Oct 4, 2021). Based on the President's prior statements, as well as the statements of his officers and nominees, the provisions targeted in this lawsuit are among those slated for elimination.

Moreover, the President's opposition to the Final Rule has affected the federal government's

---

[11]   Suzanne B. Goldberg, OCR, U.S. Dep't of Educ., Dear Students, Educators, and other Stakeholders Letter (Apr. 6, 2021), https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/20210406-titleix-eo-14021.pdf.



litigation strategy in any case involving a challenge to the Final Rule. The most prominent example occurred in *Victim Rights Law Center v Cardona*, No. 3:21-cv-01626-EMC (D. Mass Jun. 10, 2020). There, the district court issued an order of judgment, which upheld the vast majority of the Final Rule, but vacated and remanded to the Department a single provision that prohibited recipients from relying on statements not subjection to cross-examination. After the order came down, Texas contacted the Department of Justice ("DOJ") to learn whether the federal government intended to appeal the decision. DOJ replied that it has no intention of pursing an appeal. The vacated provision, like the provisions at issue here, represented one of the most controversial aspects of the Final Rule. And but for intervention of third parties, including Texas, the federal government's inaction would have enabled it to kill the policy without the need for notice and comment rulemaking.

This is not the first time the Biden Administration has utilized the tactic of strategic capitulation to evade the procedural protections required by the APA when confronted with a policy it disfavored. Back in March, the Biden Administration—without any advanced warning—ordered the Department of Homeland Security ("DHS") to voluntarily dismiss appeals in the Supreme Court as well as the Fourth, Seventh, and Ninth Circuits defending an immigration rule that the Administration found uncongenial. Press Release, U.S. Dep't. of Homeland Security, DHS Secretary Statement on the 2019 Public Charge Rule (Mar. 9, 2021), https://www.dhs.gov/news/2021/03/09/dhs-secretary-statement-2019-public-charge-rule. The press statement issued by the Department of Homeland Security helps explain why. By dismissing the Seventh Circuit appeal, the final judgment from the Northern District of Illinois, which vacated the rule, would go into effect. *Id.* The Biden Administration therefore was able to effectively rescind the regulation without going through notice and comment rulemaking.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  For these reasons, Texas has sought intervention in every ongoing case seeking to set aside

2  the Final Rule.[12] Recognizing that its interests will not be protected unless it intervenes here as well,

3  Texas files this motion.

4  ## LEGAL STANDARD

5  The Federal Rules provide two mechanisms for third-party intervention in a lawsuit:

6  intervention of right under Rule 24(a) and permissive intervention under Rule 24(b). For

7  intervention of right to apply, the movant must demonstrate that: (1) the motion is timely; (2) the

8  movant has a legally protected interest in the action; (3) the action must threaten to impair that

9  interest; and (4) the movant's interest is not adequately represented by the existing parties. *See Prete*

10 *v. Bradbury*, 438 F.3d 949, 954 (9th Cir. 2006). "In determining whether intervention is appropriate,

11 courts are guided primarily by practical and equitable considerations, and the requirements for

12 intervention are broadly interpreted in favor of intervention." *United States v. Alisal Water Corp.*,

13 370 F.3d 915, 919 (9th Cir. 2004). "[T]he inquiry" into Rule 24(a) is therefore "flexible one, which

14 focuses on the particular facts and circumstances surrounding each application" *Edwards v. City of*

15 *Houston*, 78 F.3d 983, 999 (5th Cir. 1996). "[I]ntervention must be "measured by a practical rather

16 than technical yardstick." *Id.*; *see also California v. Health & Human Servs.*, 330 F.R.D. 248, 252

17 (N.D. Cal. 2019) (stating that intervention should not turn on "technical distinctions").

18 To qualify for permissive intervention, the movant must show: (1) an independent ground

19 for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of

20 law or fact in common with the main action. *League of United Latin Am. Citizens v. Wilson*, 131

21 F.3d 1297, 1308 (9th Cir. 1997). As its name would suggest, permissive intervention is discretionary

22 so long as the movant meets the abovementioned requirements. *Kukui Gardens Corp. v. Holco*

23 *Capital Grp., Inc.*, 261 F.R.D. 523, 534 (D. Haw. 2009). Nevertheless, the Ninth Circuit has

24 generally endorsed "liberal construction in favor of applications for intervention." *Bresgal v. Brock*,

25 637 F. Supp. 271, 272 (D. Or. 1985), *aff'd as modified*, 843 F.2d 1163 (9th Cir. 1987). A liberal

26

27 ───────────────
[12] *See* Electronic Order, *VRLC v. Cardona*, No. 1:20-cv-11104-WGY (D. Mass Sept. 27, 2021);
Minute Order, *Commonwealth of Pennsylvania v. Cardona*, No. 1:20-cv-01468-CJN (D.D.C. Feb.
28 4, 2021).

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

approach to intervention is especially appropriate "where the subject matter of the lawsuit is of great public interest, the intervenor has a real stake in the outcome and the intervention may well assist the court in its determination through . . . the framing of issues." *Daggett v. Comm'n on Gov't Ethics*, 172 F.3d 104, 116–17 (1st Cir. 1999) (Lynch, J., concurring).

Texas meets the requirements for both intervention as of right and permissive intervention.

### ARGUMENT

## I.    The Court Should Grant Intervention As Of Right.

### A.    Texas's motion is timely.

Plaintiff commenced this action on March 8, 2021. Texas filed its motion to intervene on April 7, 2021, less than a month after Plaintiff submitted its complaint. That motion became moot when this Court dismissed Plaintiff's complaint for lack of standing with leave to amend. *See Alpha Inv., LLC v. Zynga, Inc.*, No. C 11-03500 JSW, 2012 WL 832447, at *5 (N.D. Cal. Mar. 12, 2012). In accordance with the Court's deadlines, Plaintiff submitted its First Amended Complaint on October 4, 2021. Texas filed a new motion to intervene just two weeks later. Based on this timeline, there can be no doubt that the motion is timely. *See Raytek, Inc. v. Omega Eng'g, Inc.*, C-93-20188 RMW PVT, 1993 WL 404088, at *2 (N.D. Cal. Sept. 22, 1993)

When evaluating timeliness, courts in this jurisdiction look to three factors: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay. *Retiree Support Group of Contra Costa Cnty. v. Contra Costa Cnty.*, 315 F.R.D. 318, 321 (N.D. Cal. 2016). Here, Texas sought intervention at the earliest stage of litigation. It filed its first motion to intervene before the Defendant appeared before this Court and before any substantive briefings and proceedings occurred. *See United States v. Blue Lake Power, LLC*, 215 F. Supp. 3d 838, 842 (N.D. Cal. 2016). Then, once its first motion was mooted, it resubmitted its request as soon as Plaintiff brought a new claim. It is hard to see how Texas could have acted more promptly once it became aware that its significant protectable interests in the Final Rule were at risk in this litigation.

/ / /

/ / /



Texas's promptness also means that there is no reasonable risk that its intervention would prejudice the existing parties or subject them to undue delay—the "most important consideration" in a court's timeliness analysis, according to the Ninth Circuit. *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 857 (9th Cir. 2016). As this Court has previously held, "[i]n the context of a timeliness analysis, prejudice is evaluated based on the difference between timely and untimely intervention—not based on the work Defendants would need to do regardless of when [Texas] sought to intervene." *Kamakahi v. Am. Soc'y for Reprod. Med.*, 11-CV-01781-JCS, 2015 WL 1926312, at *4 (N.D. Cal. Apr. 27, 2015). Texas filed its motion at the earliest point possible, well before the parties litigated any of the issues raised by the First Amended Complaint or entered into agreements that could be affected by Texas's entry into the case. If any difficulty arises from Texas's intervention, it stems from adding another party, not from the date Texas submitted its motion.[13]

**B.      As a provider of public education, Texas has a concrete, protectable interest in defending the challenged provisions of the Final Rule.**

Texas has an interest in this litigation because it is a common provider of education, directly affected by the Final Rule and any order vacating its provisions. The Texas Constitution charges the Texas Legislature "to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." Tex. Const. art. VII, § 1. Pursuant to this charge, Texas funds, regulates, and oversees the second largest system of K–12 public education in the nation, serving over 5.4 million students across 1,200 school districts. Tex. Educ. Agency, *Enrollment in Texas Public Schools 2019-20* at 1 (Aug. 12, 2020), https://tea.texas.gov/sites/default/files/enroll_2019-20.pdf. In addition, Texas funds, supports, and administers a robust network of 119 public postsecondary institutions, including 37 universities and 82 two-year colleges and technical schools.[14] *See* Tex. Higher Educ. Coordinating Bd., *2020 Texas*

---

[13] Texas' intervention, if anything, will disruption to this case should the federal government—as it has in other cases—withdraw its support of the Final Rule and refuse to defend it. *See infra* Part I.D.

[14] To offer a sense of scale, most states have just one or two public university systems. Texas has six. The largest—the University of Texas—has 13 separate locations that educate approximately 240,000 students each year. *See About the University of Texas System*, The University of Texas (footnote continued)

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7765-5807.1                    10                    Case No. 3:21-cv-01626-EMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

1   *Public Higher Education Almanac* at 28, 47 (Sept. 28, 2020), https://

2   reportcenter.highered.texas.gov/agency-publication/almanac/2020-texas-public-higher-education

3   -almanac/. All told, the State's entire network of higher education enrolled just shy of 1.7 million

4   students in 2019. *See* Tex. Higher. Educ. Coordinating Bd., at 13.

5          Because Texas receives federal funding from the Department for K–12 education,[15] Texas's

6   public primary and secondary education systems are subject to Title IX and the regulations

7   effectuating Title IX, such as the Final Rule. Likewise, each of the institutions in Texas's systems

8   of higher education receives federal funding and is subject to the Final Rule. Under Texas law,

9   public institutions of higher education constitute "arms" and "instrumentalities" of the State. *Daniel*

10  *v. Univ. of Tex. Sw. Med. Ctr.*, 960 F.3d 253, 257 (5th Cir. 2020). Texas therefore has an obligation,

11  through its colleges and universities, to investigate and enforce alleged violations of Title IX. Should

12  Texas, or any of Texas's affiliated academic institutions, deviate from the Department's guidance,

13  that departure would invite either an enforcement action at the risk of significant monetary penalties,

14  up to and including the loss of federal funds. Texas is intensely interested in the Final Rule as a

15  result. Indeed, its interests are the "mirror-image" of Plaintiff's interests. While Plaintiff alleges that

16  it "[is] being injured by the [Final Rule]," Texas "w[ould] be injured by [the Final Rule's]

17  invalidation." *Builders Ass'n of Greater Chicago v. City of Chicago*, 170 F.R.D. 435, 440 (N.D. Ill.

18  1996).

19          *First*, the Final Rule clarified the definition of sexual harassment as well as the conditions

20  that must be met before a recipient's obligations under Title IX are activated. Invalidating the Final

21  Rule would create uncertainty, harming the Texas institutions regulated under Title IX. Earlier

22  guidance had caused a great deal of uncertainty regarding recipients' legal responsibilities under

23  Title IX. *See supra* at 2. Recipients did not know how to comply with the new mandates or whether

24

25  ─────────────────

    System, https://www.utsystem.edu/about (last visited Sept. 21, 2021).

26

27  [15] *See* Tex. Educ. Agency, 2020 *Comprehensive Biennial Report on Texas Public Schools* at 297
    (Dec. 4, 2020) (reporting that Texas received $5.3 billion dollars for K-12 education, which
    represented 16.4 percent of the total funds Texas spent in FY 2020), https://tea.texas.gov/sites/

28  default/files/comp_annual_biennial_2020.pdf (last visited Sept. 21, 2021).


LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

failure to do so would incur legal consequences. *See* Janet Napolitano, *"Only Yes Means Yes": An Essay on University Policies Regarding Sexual Violence and Sexual Assault*, 33 YALE L. & POL'Y Rev. 387, 394–95 (2015). In an abundance of caution, many academic institutions, including those funded by Texas, elected to revise their policies to cover a greater range of conduct and make it easier for administrators to arrive at a determination of guilt. *See Doe v. Univ. of Scis.*, 961 F.3d 203, 213 (3d Cir. 2020) (describing the pressure universities faced as a result of the Dear Colleague Letter). But that led to litigation. Hundreds of lawsuits have been filed since the 2011 Dear Colleague Letter was issued—a sizeable number of which academic institutions lost or settled.[16]

   *Second*, the Final Rule reduced Texas's risk of liability. While previous guidance had supported an improperly broad view of Title IX liability, the Final Rule confined Title IX liability to proper the limits set by statute. Plaintiffs' First Amended Complaint in fact objects to the Final Rule precisely because the regulations "narrowed" the definition of "sexual harassment" and "program or activity," which relieved recipients of certain responsibilities. ECF 78 ¶¶ 33, 37–53; § 106.30(a)(2). The changes to Texas's liability did not stop there. The Final Rule clarified the standard under which recipients may be found liable—namely, recipients must have actual knowledge and be deliberately indifferent to the alleged harassment. §§ 106.30(a), 106.44(a). And the Final Rule rejected the misapprehension created by the Department's earlier guidance that Title IX requires recipients to restrict students' constitutional rights to avoid a finding of noncompliance. § 106.44(a).

   Earlier guidance, issued by the Department, had put recipients like Texas between a rock and a hard place: academic institutions were advised to treat Title IX compliance as a zero-sum calculation, where the rights and interests of some students were sacrificed for the sake of others.[17]

---

[16] *See* Jonathan Taylor, Milestone: 700+ Title IX/Due Process Lawsuits by Accused Students, Title IX for All (May 11, 2021), https://titleixforall.com/milestone-700-title-ix-due-process-lawsuits-by-accused-students/

[17] *See, e.g.*, Russlynn Ali, OCR, U.S. Dept. of Educ., Dear Colleague Letter: Sexual Violence (Apr. 4, 2011) (conditioning student's right to due process on it not "restrict[ing] or unnecessarily delay[ing] the Title IX protections for the complainant"), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Not following the guidance would risk a federal or private enforcement action, imperiling federal funds, but following the guidance would lead to civil rights lawsuits, litigation expenses, and ultimately monetary settlements. The Final Rule resolved this dilemma by not only reaffirming the primacy of the U.S. Constitution, but also by stipulating standards for recipients to adopt that protect the rights and interests of all parties to a disciplinary proceeding. The revised definition of sexual harassment, which Plaintiff seeks to set aside, was among the safeguards added, as it helped ensure that academic institutions targeted harassing conduct as opposed to speech that was merely controversial and/or unpopular.

These interests support intervention. "It is generally enough that the interest asserted is protectable under some law, and that there is a relationship between the legally protected interest and the claims at issue." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001). For example, in *California v. Health & Human Services*, Oregon sought to intervene in a lawsuit challenging federal regulations related to the contraception mandate. 330 F.R.D. at 253. This Court concluded that the regulations' impact on Oregon's finances, public health, and sovereignty constituted significant protectable interests as defined by Rule 24(a). *Id.* Setting aside the challenged provisions of the Final Rule would have similar implications for Texas. Thus, if Oregon satisfied Rule 24(a)'s second prong, then so too does Texas. *See S.E.C. v. Navin*, 166 F.R.D. 435, 440 (N.D. Cal. 1995).[18]

### C.   The disposition of this action will substantially impair or impede Texas's interests.

Texas "would be substantially affected in a practical sense by the determination made" in this action; it therefore "should, as a general rule, be entitled to intervene" *Sw. Ctr. for Biological Diversity*, 268 F.3d at 822. As explained above, the Final Rule provides important benefits to Texas,

---

[18] This Court ultimately determined that Oregon could not intervene as of right because it wished to join as a Plaintiff, and was able to protect its interests by filing a separate action and seeking injunctive relief. *Health & Human Services,* 330 F.R.D. at 253. Instead, this Court granted Oregon permissive intervention under Rule 24(b). *Id.* at 254–55. Texas should at minimum receive the same relief. But it is also entitled to intervention as of right; it seeks to intervene as *defendant* does not have the option to protect its interests by filing its own suit. Should Plaintiff succeed, the Final Rule will be set aside, and Texas will lose all attendant benefits.



LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

its schools, and its citizens. It both limits the scope of potential Title IX liability and clarifies how schools can comply with *all* their legal obligations. But Plaintiff asks this Court to deprive Texas of those benefits by "setting aside" the Final Rule. *See* ECF 78 at 32. Those "practical consequences" are more than sufficient to show impairment of Texas' interests. *Nat. Res. Def. Council v. Norton*, 1:05CV01207 OWW TAG, 2006 WL 39094, at \*10 (E.D. Cal. Jan. 5, 2006); *see also California ex rel. Lockyer v. United States*, 450 F.3d 436, 442 (9th Cir. 2006). When a movant benefits from a regulation, invalidation of that regulation would necessarily impair the movant's interests. *See, e.g.*, *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011); *Sw. Ctr. for Biological Diversity* 268 F.3d at 822; *see also Syngenta Seeds, Inc. v. Cnty. of Kauai*, CIV. 14-00014BMK, 2014 WL 1631830, at \*5 (D. Haw. Apr. 23, 2014).

Relegation to the status of amicus curiae also would not adequately protect Texas' interests. This suit bears characteristics of sue and settle litigation, where an advocacy or interest group files a lawsuit against a like-minded agency for the purpose of negotiating a collusive settlement.[19] Even if that was not Plaintiff's original intention, the Biden Administration has established its willingness to use strategic settlement to circumvent the need for notice-and-comment rulemaking. *See, e.g.*, *City & Cnty. of San Francisco v. U.S. Citizenship & Immig. Servs.*, 992 F.3d 742, 752 (9th Cir. 2021) (VanDyke, J., dissenting) (discussing the Biden Administration's "cooperative dismissals"). As amici, Texas' participation would be limited. Not only would it be precluded from filing motions or introducing an issue or defense not raised by the parties, but it also would likely lack standing to object to a collusive settlement or to appeal an adverse judgment. *San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 59 F. Supp. 2d 1021, 1033 (N.D. Cal. 1999); *cf. S.E.C. v. Private Equity Mgmt. Group, Inc.*, CV 09-2901 PSG (EX), 2009 WL 2488044, at \*6 n.5 (C.D. Cal. Aug. 10, 2009) (describing amicus curiae "as non-parties who can only provide general information and assistance" to the court). Texas would have no means of defending the status quo.

---

[19] *See* A Time to Reform: Oversight of the Activities of the Justice Department's Civil, Tax, and Environment and Natural Resources Divisions and the U.S. Trustee Program, *Hearing Before the Subcomm. on Regulatory Reform, Commercial & Antitrust Law of the H. Comm. on the Judiciary*, 115th Cong. 2 (2017) (statement of Andrew M. Grossman, Partner, Baker & Hostetler LLP).


LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

**D.     None of the parties adequately represent Texas's interests.**

By definition, Texas's interests are not being adequately represented by an Administration that is demonstrably hostile to the rule it purports to defend. Rule 24(a)'s inadequate representation requirement is "a light one." *Bates v. Jones*, 904 F. Supp. 1080, 1087 (N.D. Cal. 1995). The Ninth Circuit recognizes a presumption of adequate representation when "the government is acting on behalf of a constituency that it represents," but neither Rule 24(a)(2) nor the caselaw in this jurisdiction oblige courts to close their eyes to the reality that Texas's and the federal government's interests no longer align. *Citizens for Balanced Use*, 647 F.3d at 898. "Intervention does not require absolute certainty," even when a presumption applies. *Id.* at 900. Instead, the focus is whether the movant has made a "very compelling showing" that its interests "*may not* be adequately represented." *Arakaki v. Cayetano*, 324 F.3d 1078, 1086–87 (9th Cir. 2003), as amended (May 13, 2003); *see also Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). Texas has made such a showing here.

As the Department has acknowledged, "[t]he most important factor" in determining whether adequate representation exists is "how the [intervenor's] interest compares with the interests of existing parties." ECF 28 at 2 (quoting *Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 950–51 (9th Cir. 2009)). Here, Texas's interests are *not* aligned with the Administration who (erroneously) views the Final Rule, including the challenged provisions, as a "green light to ignore sexual violence and strip survivors of their civil rights under Title IX," *The Biden Agenda for Women*, JOEBIDEN.COM, https://joebiden.com/womens-agenda/. The Biden Administration has promised to put the Final Rule "to a quick end," *id.,* has ordered the Department to eliminate or revise any provision inconsistent with the Administration's policies, ECF 161, and has refused to defend the Rule in other litigation, *supra* at 6.

The Department, in other words, has a stake in seeing the four challenged provisions fail, which "would preclude [the Department's] vigorous defense of the" regulations. *Int'l Fur Trade Fed'n v. City & Cnty. of San Francisco*, 20-CV-00242-RS, 2020 WL 6931066, at *2 (N.D. Cal. Apr. 17, 2020) (inquiring whether government defendants have "a conflict of interest'). The Department has already announced that it will conduct rulemaking pursuant to the President's executive order,



LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

but the process will take years. The Department does not expect to have a proposed rule ready until May 2022, and even then, the Department still has to open the rule up for public comments. An adverse judgment from this Court would bypass that process (and accompanying delay) entirely, allowing the Biden Administration to attain its policy objectives without the procedural protections required by the APA. This is why the Department refused to pursue an appeal in *Victim Rights Law Center*, when the district court vacated a key provision in the Final Rule governing the evidentiary standards for Title IX hearings. *See* Email from Rebecca Kopplin, ECF 188-4, *Victim Rights Law Center v. Cardona*, No. 1:20-cv-11104 (Sept. 24, 2021). The Department has a clear incentive—and intent—to capitulate to Plaintiff's demands.

As a matter of fact, the Biden Administration already employed this tactic of strategic capitulation to topple the public charge rule,[20] which, like the Final Rule, the President had promised to "reverse" once in office. *The Biden Plan for Securing Our Values as a Nation of Immigrants*, JOEBIDEN.COM, https://joebiden.com/immigration/ (last visited Sep. 22, 2021). There, the Biden Administration ordered the Department of Homeland Security to stop defending the public charge rule because the Administration determined that the rule was incompatible with its planned immigration policy. *See* Press Release, U.S. Dep't. of Homeland Security, https://www.dhs.gov/news/2021/03/09/dhs-secretary-statement-2019-public-charge-rule. In accordance with this announcement, DOJ moved to dismiss pending appeals in the Supreme Court, Seventh Circuit, and Fourth Circuit, allowing an adverse judgement from the Northern District of Illinois vacating the public charge rule to go into effect. When a coalition of States sought to intervene only two days later to defend their interests, they were told they waited too late. *City & Cnty. of San Francisco*, 992 F.3d at 743-44, 749 (VanDyke, J., dissenting).

For these reasons, Texas' motion can be distinguished from the two motions filed by the Foundation for Individual Rights in Education (FIRE) in *Victim Rights Law Center* and *New York v. United States Dep't of Educ*, 20-CV-4260 (JGK), 2020 WL 3962110 (S.D.N.Y. July 10, 2020).

---

[20] The 2019 public charge rule clarified the factors the government would consider when determining whether someone was likely at any time in the future to become a public charge and was therefore ineligible for admission or adjustment of immigration status.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    In both of those instances, FIRE sought intervention well before the current administration assumed

2    office, when the Department and FIRE shared the "same ultimate objective." *Freedom from Religion*

3    *Found., Inc. v. Geithner*, 644 F.3d 836, 841 (9th Cir. 2011). A better touchstone is *Commonwealth*

4    *of Pennsylvania v. DeVos*, where the D.C. District Court granted Texas motion because it filed the

5    motion "near the time its interests diverged from the Department of Education" 1:20-cv-01468-CJN

6    (D.D.C. Feb. 4, 2021). The evidence of the Department's hostility to the Final Rule has only grown

7    more compelling since then. Both the Biden Administration and the Department have taken specific

8    and deliberate steps towards the Final Rule's appeal. The Biden Administration additionally has

9    shown a willingness to withdraw from the defense of its predecessor's policies when doing so

10   enables it to evade notice and comment rule making. Hence, this is not an occasion where the

11   proposed intervenor's only support is a change in administration and campaign statements. *United*

12   *States v. City of Los Angeles*, 288 F.3d 391, 403 (9th Cir. 2002) (noting that campaign statements

13   and a change in administration are "insufficient by themselves"). The totality of the Biden

14   Administration's actions establish that the federal government is unable adequately represent Texas.

15   Any presumption to the contrary has been rebutted.

16   **II.      In The Alternative, The Court Should Permit Permissive Intervention.**

17        As set forth in Section I, *supra.*, Texas easily meets the requirements for intervention as of

18   right. But even if it did not, this Court should exercise its "wide latitude" and permit Texas to

19   intervene in this action under Rule 24(b) instead. *Oakland Bulk & Oversized Terminal, LLC v. City*

20   *of Oakland*, 960 F.3d 603, 619 (9th Cir. 2020).

21        Texas satisfies all three threshold requisites for permissive intervention. *Health & Human*

22   *Services*, 330 F.R.D. at 252, 254 (N.D. Cal. 2019) (permitting the State of Oregon to intervene in

23   action challenging a federal agency's final rules). *First,* Texas has an independent ground for subject

24   matter jurisdiction, as this action raises a federal question, and Texas would establish federal-

25   question jurisdiction independent of Plaintiff's ability to do so. *Id.*; *see also Int'l Paper Co. v.*

26   *Inhabitants of Town of Jay*, 887 F.2d 338, 347 (1st Cir. 1989) (holding that independent jurisdiction

27   exists when the state seeks to defend the statute against a challenge based on federal law). *Second*,

28   Texas's motion is timely. As explained above, Texas sought intervention within a month of Plaintiff



LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7765-5807.1                                              17                              Case No. 3:21-cv-01626-EMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

initiating this legal action and again just two weeks after Plaintiff filed an amended petition. *See supra* Part I.A. Accordingly, Texas has not delayed, much less prejudiced any of the existing parties. *Third*, Texas's position in support of the Final Rule involves common questions of law and fact. *E.E.O.C. v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1047 (D.C. Cir. 1998) (noting courts typically "afforded this requirement considerable breadth"). Both "the main action" and Texas's defense center on whether the Final Rule is consistent with Title IX and the Administrative Procedures Act. Fed. R. Civ. P. 24(b)(1)(B). Those common questions of law and fact are sufficient for permissive intervention. *See Health & Hum. Servs.*, 330 F.R.D. at 254.

Finally, the Court should exercise its discretion to permit intervention because Texas seeks to defend interests that will otherwise go unprotected in the proceeding. As the Ninth Circuit has recognized, permissive intervention is concerned with "the fairest and most efficient method of handling a case." *Venegas v. Skaggs*, 867 F.2d 527, 530 (9th Cir. 1989), *aff'd sub nom. Venegas v. Mitchell*, 495 U.S. 82 (1990). In making this determination, the courts look to additional factors, which include whether the movant's interests are adequately represented. *Id.*; *see also Scholl v. Mnuchin*, 483 F. Supp. 3d 822, 825 (N.D. Cal. 2020) (listing relevant factors). Texas is a common provider of education, whose schools, universities, and other academic programing are subject to Title IX. But unlike the Biden Administration, Texas believes that the Final Rule will both facilitate enforcement of Title IX and discourage unconstitutional practices that have violated the rights of individuals on campus. Texas therefore has a stake in the Final Rule (as well as a perspective of its effects) that the parties—who are now aligned on policy—do not share. *See Or. Env't Council v. Or. Dep't of Env't Quality*, 775 F. Supp. 353, 359 (D. Or. 1991) (basing its decision on "whether the intervenor would contribute to a full development of the underlying issues in the suit"); *see also Humane Soc. of U.S. v. Clark*, 109 F.R.D. 518, 521 (D.D.C. 1985) (judging it appropriate "[i]n light of the 'scope and complexity of plaintiff's challenge,'" to have absent interests "directly represented"). Thus, even to the extent the federal government participates in future proceeding, Texas' addition to the case will ensure that there is a party to this action willing to pursue all available arguments and procedures in the Final Rule's defense.

/ / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    The remaining factors—i.e. the possibility of undue delay, judicial economy, and the nature

2  of movant's interest—are addressed earlier in Texas's arguments, *see supra* Part I.A–B, and

3  likewise are "clearly weighed in favor of permissive intervention." *Skaggs*, 867 F.2d at 530.

4

5  Dated:  October 18, 2021                    Respectfully submitted.

6                                              */s/ Patrick K. Sweeten*
7                                              Patrick K. Sweeten
                                               Deputy Attorney General for Special Litigation
8                                              Ken Paxton
                                               Attorney General of Texas
9                                              Brent Webster
                                               First Assistant Attorney General
10                                             Grant Dorfman
                                               Deputy First Assistant Attorney General
11                                             William T. Thompson
                                               Deputy Chief, Special Litigation Unit
12                                             Kathleen T. Hunker
                                               Special Counsel
13

14

15                                             LEWIS BRISBOIS BISGAARD & SMITH LLP

16                                             */s/ Michael K. Johnson*
                                               Michael K. Johnson
17                                             Attorneys for Defendant
                                               KEN PAXTON IN HIS OFFICIAL CAPACITY
18                                             AS  ATTORNEY GENERAL OF TEXAS

19

20

21

22

23

24

25

26

27

28


LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW