Adele P. Kimmel (CA Bar No. 126843)
Alexandra Z. Brodsky*
Public Justice
1620 L Street NW, Suite 630
Washington, DC 20036
Ph: (202) 797-8600
Fax: (202) 232-7203
Email: akimmel@publicjustice.net
        abrodsky@publicjustice.net

*admitted pro hac vice

Listing continues on next page

Counsel for Plaintiff The Women's Student Union

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE WOMEN'S STUDENT UNION, <br><br> *Plaintiff*, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION, <br><br> *Defendant*. | **PLAINTIFF'S OPPOSITION TO STATE OF TEXAS'S MOTION TO INTERVENE AS DEFENDANT** <br><br> Civil Action No. 3:21-cv-01626-EMC <br><br> Judge: Honorable Edward M. Chen <br><br> Hearing: January 20, 2021, 1:30 PM (virtual) Courtroom 5, 17th Floor, 450 Golden Gate Ave., San Francisco, CA 94102 |

John He (CA Bar No. 328382)
Public Justice
475 14th Street, Suite 610
Oakland, CA 94612
Ph: (510) 622-8150
Fax: (202) 232-7203
Email: jhe@publicjustice.net

Linda M. Correia*
Lauren A. Khouri*
Correia & Puth, PLLC
1400 16th Street NW, Suite 450
Washington DC 20036
Ph: (202) 602-6500
Fax: (202) 602-6501
Email: lcorreia@correiaputh.com
        lkhouri@correiaputh.com

*admitted pro hac vice

*Plaintiff's Opposition to Texas's Motion to Intervene - 3:21-cv-01626-EMC*

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................. 1

FACTUAL BACKGROUND ............................................................................... 1

ARGUMENT ........................................................................................................ 5

I.     Texas Is Not Entitled To Intervene As Of Right ...................................... 5

       A.     Texas Has Not Established a Non-Speculative Protectable Interest Related
              to WSU's Claims ................................................................................. 6

       B.     Texas Will Have Other Opportunities to Defend Its Interests .............. 10

       C.     Texas Has Not Overcome The Presumption of Adequate Representation ........... 12

              1.     Texas Has Not Demonstrated the Defendant Does Not Share Its Objective . 12

              2.     Texas's Belief that the Defendant Will Make Different Legal Strategic
                     Decisions is Insufficient to Demonstrate Inadequate Representation ........... 14

II.    The Court Should Deny Texas Permissive Intervention ........................... 15

       A.     Texas's Alleged Interests are Too Speculative and Attenuated from
              WSU's Claims ................................................................................. 16

       B.     Texas Has Not Overcome the Presumption that the Defendant Will
              Represent its Interests .................................................................... 17

       C.     Texas's Intervention Will Cause Undue Delay and Prejudice............. 17

CONCLUSION ................................................................................................ 18

1

**TABLE OF AUTHORITIES**

2
**CASES**

3
*Apple Inc. v. Iancu*, No. 20-06128, 2021 WL 411157 (N.D. Cal. Feb. 5, 2021) ................... 17, 18

4
*Arakaki v. Cayetano*, 324 F.3d 1078 (9th Cir. 2003) ................................................................. 12

5
*California v. Health & Human Services*, 330 F.R.D. 248 (N.D. Cal. 2019) ................................. 8

6
*Carroll v. Wells Fargo*, No. 15-02321, 2016 WL 3951650 (N. D. Cal. July 22, 2016) .............. 17

7
*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ...................................................................... 8

8
*Ctr. for Biological Diversity v. Jewell*, No. C 13-1749 PSG, 2013 WL 4127790 (N.D. Cal. Aug.
9
 9, 2013) ..................................................................................................................................... 10

10
*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) ........ 14, 15

11
*Donnelly v. Glickman*, 159 F.3d 405 (9th Cir. 1998) .................................................................. 16

12
*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) ................................................................. 3

13
*Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836 (9th Cir. 2011) ................... 6, 12

14
*Greene v. United States*, 996 F.2d 973 (9th Cir. 1993) ........................................................... 6, 10

15
*Habeas Corpus Res. Ctr. v. U.S. Dep't of Just.*, 627 F. App'x 662 (9th Cir. 2015) .................. 6, 7

16
*In re Volkswagen "Clean Diesel" Mktg.,* 894 F.3d 1030 (9th Cir. 2018) ..................................... 5

17
*Med. Advocates for Healthy Air v. EPA*, No. 11-3515, 2011 WL 4834464 (N. D. Cal. Oct. 12,
18
 2011) ..................................................................................................................................... 6, 16

19
*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986) ............................................................... 3

20
*Michigan v. EPA*, 576 U.S. 743 (2015) ....................................................................................... 14

21
*Mishewal Wappo Tribe of Alexander Valley v. Salazar*, No. 5:09-CV-02502 EJD, 2012 WL
22
 4717814 (N.D. Cal. Sept. 28, 2012) ....................................................................................... 16

23
*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983)..15

24
*New York v. U.S. Dep't of Educ.*, No. 20-CV-4260 (JGK), 2020 WL 3962110 (S.D.N.Y.
25
 July 10, 2020).................................................................................................................... 11, 18

26
*Nikon Corp. v. ASM Lithography B.V.*, 222 F.R.D. 647 (N.D. Cal. 2004) ................................. 10

27
*Nw. Forest Res. Council v. Glickman*, 82 F.3d 825 (9th Cir. 1996) ........................................... 14

28

*Perry v. Proposition 8 Off. Proponents*, 587 F.3d 947 (9th Cir. 2009) ........................................ 15

*Perry v. Schwarzenegger*, 630 F.3d 898 (9th Cir. 2011) ........................................................ 8, 9

*Plummer v. Univ. of Houston*, 860 F.3d 767 (5th Cir. 2017).................................................... 7

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) .................................................................... 14

*Sierra Club v. EPA*, No. 13-2809, 2013 WL 5568253 (N.D. Cal. Oct. 9, 2013) ........................ 17

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*, 101 F.3d 503 (7th Cir. 1996) ............................................................................................................................ 14

*Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326 (9th Cir. 1977) .............................. 16, 17

*UMG Recordings, Inc. v. Bertelsmann AG*, 222 F.R.D. 408 (N.D. Cal. 2004) ........................... 17

*United States v. Alisal Water Corp.*, 370 F.3d 915 (9th Cir. 2004) ...................................... 6, 10

*United States v. City of Los Angeles*, 288 F.3d 391 (9th Cir. 2002) ...................... 10, 11, 12, 14

*United States v. Sprint Comm., Inc.*, 855 F.3d 985 (9th Cir. 2017) ........................................ 6

*Valley View Health Care, Inc. v. Chapman*, No. 1:13-CV-0036-LJO-BAM, 2013 WL 4541602 (E.D. Cal. Aug. 27, 2013) .............................................................................................. 12

*Victim Rts. L. Ctr. v. Cardona*, -- F.Supp.3d ---, 2021 WL 3185743 (D. Mass. July 28, 2021) .. 13

*Victim Rts. L. Ctr. v. Rosenfelt*, 988 F.3d 556 (1st Cir. 2021) .......................................... 12, 18

*Walsh v. Hodge*, 975 F.3d 475 (5th Cir. 2020) ................................................................. 7

**STATUTES**

5 U.S.C. § 553 ......................................................................................................... 11

5 U.S.C. § 706 ......................................................................................................... 12

20 U.S.C. § 1681 ....................................................................................................... 5

20 U.S.C. § 1682 ...................................................................................................... 11

20 U.S.C. § 1683 ...................................................................................................... 11

Tex. Educ. Code § 51.251(5) ...................................................................................... 9

Tex. Labor Code § 21.106 .......................................................................................... 9

**FEDERAL RULES**

Federal R. Civ. P. 24(a)(2) ............................................................................................ 5

Federal R. Civ. P. 24(b)(3) ................................................................................... 16, 17

Federal R. Civ. P. 24(b)(1)(B) ................................................................................... 15

**FEDERAL REGULATIONS AND EXECUTIVE ORDERS**

29 C.F.R. § 1604.11(a) ................................................................................................ 3

29 C.F.R. § 1604.11(d) ................................................................................................ 3

34 C.F.R. § 100.8(c) .................................................................................................. 11

34 C.F.R. § 106 ............................................................................................................ 1

34 C. F. R. § 106.30(a) ................................................................................................. 2

34 C.F.R. § 106.30(a)(2) .............................................................................................. 1

34 C.F.R. § 106.45(b)(6)(i) ........................................................................................ 13

34 C.F.R. § 106.71 .................................................................................................... 11

Exec. Order No. 14021, 86 Fed. Reg. 13,803 (Mar. 8, 2021) ................................... 4

**U.S. DEPARTMENT OF EDUCATION DOCUMENTS**

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance,* 85 Fed. Reg. 30,026 (May 19, 2020) ..................................... 1

Office for Civil Rights Blog – 20200522 (May 22, 2020), https://www2.ed.gov/about/offices/list/ocr/blog/20200522.html. .......................... 13

*Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance,* 59 Fed. Reg. 11,448 (Mar. 10, 1994) ...................................................... 3

*Revised Sexual Harassment Guidance,* 66 Fed. Reg. 5,512-01 (Jan. 19, 2001), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf ................................. 3

*Sexual Harassment Guidance,* 62 Fed. Reg. 12,034 (Mar. 13, 1997) .......................... 3

Suzanne B. Goldberg, U.S. Dep't. of Educ., *Letter to Students, Educators, and other Stakeholders re Executive Order 14021* (Apr. 6, 2021), https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/20210406-titleix-eo-14021.pdf. ............................................................................................................... 4

U.S. Dep't. of Educ., *Dear Colleague Letter: Harassment and Bullying 2* (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf ........................... 2, 3

U.S. Dep't. of Educ., *Dear Colleague Letter on Prohibited Disability Harassment* (July 25, 2000), https://www2.ed.gov/about/offices/list/ocr/docs/ disabharassltr.html ......................... 3

U.S. Dep't. of Educ., *Dear Colleague Letter on Sexual Violence 3* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf ...................... 2, 3, 9

U.S. Dep't. of Educ., *Questions and Answers on Title IX and Sexual Violence* (2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf ................................ 2

U.S. Dep't. of Educ., *Questions and Answers on the Title IX Regulations on Sexual Harassment* (2021), https://www2.ed.gov/about/offices/list/ocr/docs/202107-qa-titleix.pdf ................. 3, 5

**OTHER AUTHORITIES**

Erin E. Buzuvis, *Title IX and Procedural Fairness: Why Disciplined-Student Litigation Does Not Undermine the Role of Title IX in Campus Sexual Assault*, 78 Mont. L. Rev. 71, 79 (2017). ........................................................................................................................ 11

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, RIN: 1870-AA16, Reginfo.gov (Spring 2021), https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1870-AA16... 4

Samuel R. Bagenstos, *What Went Wrong With Title IX?*, Washington Monthly (Sept./Oct. 2015), https://washingtonmonthly.com/magazine/septoct-2015/what-went-wrong-with-title-ix/ ...... 9

Texas A&M, Department of Civil Rights and Equity Investigations, Prohibited Conduct (last visited Oct. 20, 2021), https://titleix.tamu.edu/about/prohibited-conduct/ ............................. 9

University of Texas at Austin, Handbook of Operating Procedures 3-3031, Prohibition of Sexual Assault, Interpersonal Violence, Stalking, Sexual Harassment, and Sex Discrimination (Aug. 12, 2020), https://policies.utexas.edu/policies/prohibition-sex-discrimination-sexual-harassment-sexual-assault-sexual-misconduct ...................................................................... 9

1

**INTRODUCTION**

2  The State of Texas did not like the Obama Administration's policies on Title IX.

3  Unfortunately for the merits of its motion to intervene, that is not what the Women's Student

4  Union's ("WSU's") lawsuit is about. Instead, WSU challenges four provisions of Title IX

5  regulations promulgated last summer by then Secretary of Education Elisabeth DeVos. Insisting it

6  is entitled to intervene to defend the 2020 Regulations, Texas raises vague but fiery criticism of

7  past positions by the Defendant, the U.S. Department of Education ("the Department"), while

8  broadly praising the new rules as a whole. But it never concretely explains how the state would

9  suffer if WSU succeeded and the Court struck down the specific parts of the 2020 Regulations at

10 issue in this case. As a result, Texas has failed to carry its burden to establish it is entitled to either

11 mandatory or permissive intervention. The Court should deny its motion.

12

**FACTUAL BACKGROUND**

13 In 2020, former Secretary of Education Elisabeth DeVos promulgated new Title IX

14 regulations (the "2020 Regulations") concerning how the Department would judge schools'

15 responses to sexual harassment in evaluating federal administrative civil rights complaints. *See*

16 *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal*

17 *Financial Assistance,* 85 Fed. Reg. 30,026 (May 19, 2020) (codified at various places in 34 C.F.R.

18 § 106). These regulations are massive, and massively complicated; the preamble alone is more

19 than 500 pages in the small print used in the Federal Register. *See id.* at 30,026-30,572. Only four

20 provisions, however, are at issue in this suit. *See* First Am. Compl., ECF 78, at 11-16. Specifically,

21 for purposes of evaluating federal administrative civil rights complaints, the 2020 Regulations:

22 • Narrowed the definition of sexual harassment, requiring schools to address only

23 harassment that is "severe" *and* "pervasive," 34 C.F.R. § 106.30(a)(2);

24 • Excused schools from addressing sexual harassment that occurs outside its educational

25 programs or activities, even if that harassment causes a hostile environment within an

26 educational program or activity, *id.* § 106.44(a);

27

28

- Adopted an actual knowledge standard for sexual harassment, under which schools are not responsible for their failures to address harassment they should have known about if they did not actually know about it, *id.* §§ 106.30(a), 106.44(a); and

- Adopted a deliberate indifference standard, under which a school fulfills its obligations under Title IX so long as it does not act "clearly unreasonabl[y]," and under which a school is only required to address the impact of sexual harassment on its target, not on any third parties, *id*. § 106.44(a).

The 2020 Regulations constitute a dramatic departure from the Department's long-standing interpretation of Title IX in evaluating federal administrative sexual harassment complaints, as well as its continued standards for race and disability-based harassment. In its brief, Texas rails against two Title IX policy guidances released by the Department's Office for Civil Rights ("OCR") during the Obama Administration. *See* Mem. Supp. Intervenor-Def. Texas's Mot. to Intervene as Def., ECF 84 at 3-4, 11-13.[1] In truth, those documents reiterated views OCR had long held and repeatedly publicized since 1994 through a series of policy guidances concerning schools' responsibilities to address harassment based on sex, race, and disability. Am. Compl. ¶¶ 25-32, ECF 78.

These documents expressed OCR's long-standing views, over both Democratic and Republican administrations, about what kinds of harassment schools must address and the standards the Department will use in evaluating federal administrative civil rights complaints brought by harassment victims under Title IX, Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act of 1990. *Id.* For example, these policy guidances consistently explained OCR's belief that schools must address harassment that is "severe" *or* "pervasive." Compl. ¶¶ 39-41.[2] The policy guidances also

---

[1] *See* U.S. Dep't. of Educ., *Questions and Answers on Title IX and Sexual Violence* (2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf [hereinafter "2014 Q&A"]; U.S. Dep't. of Educ., *Dear Colleague Letter on Sexual Violence 3* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf [hereinafter "2011 Dear Colleague Letter"].

[2] *See* U.S. Dep't. of Educ., *Dear Colleague Letter: Harassment and Bullying 2* (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf [hereinafter

advised regulated entities that OCR expected a school to take reasonable, prompt, and effective action in response to harassment about which it knew or should have known. Compl. ¶¶ 55, 57.[3]

OCR's positions mirrored standards developed in the 1980s for harassment complaints brought under Title VII of the Civil Rights Act of 1964, which prohibits discrimination in employment. Its definition of sexual harassment, for one, came directly from the Supreme Court and the Equal Employment Opportunity Commission ("EEOC"). *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67-68 (1986) (holding that "the gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome,'" and that employers must address sexual harassment that is "severe or pervasive" (citing EEOC's regulations at 29 C.F.R. § 1604.11(a) (1985))). OCR's use of a constructive knowledge standard in evaluating federal administrative civil rights complaints, and its expectation that schools take prompt and effective action, also reflected Title VII case law and EEOC regulations. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 799, 807 (1998) (explaining employer may be liable for negligent response to coworker harassment or failing to "exercise[] reasonable care to prevent and correct promptly any sexually harassing behavior" by supervisor); 29 C.F.R. § 1604.11(d) (explaining an employer could be liable under Title VII for sexual harassment where it "knows or should have known of [sexual harassment], unless it can show that it took immediate and appropriate corrective action").

On March 8, 2021, President Biden signed an Executive Order on Guaranteeing an Educational Environment Free from Discrimination on the Basis of Sex, Including Sexual

---

"2010 Bullying Guidance"]; U.S. Dep't. of Educ., *Dear Colleague Letter on Prohibited Disability Harassment* (July 25, 2000), https://www2.ed.gov/about/offices/list/ocr/docs/ disabharassltr.html [hereinafter "2000 Disability Harassment Guidance")]; *Sexual Harassment Guidance*, 62 Fed. Reg. 12,034, 12,034, 12,041 (Mar. 13, 1997); *Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance*, 59 Fed. Reg. 11,448, 11,449 (Mar. 10, 1994) [hereinafter "1994 Racial Harassment Guidance"]; *see also* 2011 Dear Colleague Letter at 3 (explaining the difference between permissible and impermissible sexual conduct it whether it was "unwelcome"); *Revised Sexual Harassment Guidance*, 66 Fed. Reg. 5,512-01 (Jan. 19, 2001), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf (same).

[3] *See* 2014 Q&A at 3; 2011 Dear Colleague Letter at 4; 2010 Bullying Guidance at 2-3; Revised Sexual Harassment Guidance at iii, 9-14; 2000 Disability Harassment Guidance; Sexual Harassment Guidance at 12,042-43; 1994 Racial Harassment Guidance at 11,450.

Orientation or Gender Identity. Exec. Order No. 14021, 86 Fed. Reg. 13,803 (Mar. 8, 2021). The Executive Order announced that "[i]t is the policy of [President Biden's] Administration that all students should be guaranteed an educational environment free from discrimination on the basis of sex, including discrimination in the form of sexual harassment, which encompasses sexual violence, and including discrimination on the basis of sexual orientation or gender identity." *Id.* The Executive Order instructed the Secretary of Education to "review all existing regulations, orders, guidance documents, policies, and any other similar agency actions (collectively, agency actions) that are or may be inconsistent with the [announced] policy." *Id.* Among the agency actions that require review, the Executive Order specified, are the 2020 Regulations. *Id.* The Executive Order did not instruct the Defendant to rescind or stop enforcing the 2020 Regulations, and did not mention the provisions at issue in WSU's lawsuit. *See id.*

On April 6, 2021, Suzanne Goldberg, the Education Department's Acting Assistant Secretary for Civil Rights, released a letter explaining the process by which the Department would undertake its review. Suzanne B. Goldberg, U.S. Dep't. of Educ., *Letter to Students, Educators, and other Stakeholders re Executive Order 14021* (Apr. 6, 2021), https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/20210406-titleix-eo-14021.pdf. In that letter, Goldberg indicated that the Department anticipates that – after soliciting public comments – it will "publish[] in the Federal Register a notice of proposed rulemaking to amend the Department's Title IX regulations." *Id.* at 2-3. The letter does not indicate the Department intends to change any of the provisions WSU challenges and does not suggest that the Department will not enforce the current regulations in the interim. *See id.*

The Administration's biannual Uniform Regulatory Agenda states that the Department intends to issue a notice of proposed rulemaking relating to Title IX no earlier than May 2022. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, RIN: 1870-AA16, Reginfo.gov (Spring 2021), https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1870-AA16. That notice, like the Assistant Secretary Goldberg's letter, does not indicate that the Department intends

1   to change any of the provisions WSU Challenges. It states only that "[t]he Department plans to

2   propose to amend its regulations implementing Title IX of the Education Amendments of 1972,

3   20 U.S.C. 1681 *et seq*., consistent with the priorities of the Biden-Harris Administration,

4   including" the previously mentioned executive orders concerning discrimination on the basis of

5   sexual orientation and gender identity, as well as sexual harassment."

6        In July 2021, OCR published a "Q&A" guidance document to explain schools' current

7   Title IX responsibilities regarding sexual harassment. *See* U.S. Dep't. of Educ., *Questions and*

8   *Answers   on   the   Title   IX   Regulations   on   Sexual   Harassment* (2021),

9   https://www2.ed.gov/about/offices/list/ocr/docs/202107-qa-titleix.pdf [hereinafter "2021 Q&A"].

10  That guidance document is faithful to the 2020 Regulations, indicating that the Department

11  continues to enforce the Trump-era rules as written. *See, e.g.*, *id*. at 4-8 (explaining definition of

12  sexual harassment under 2020 Regulations); *id*. at 8-10 (explaining geographic limitations

13  imposed by 2020 Regulations); *id*. at 10-13 (explaining notice requirement imposed by 2020

14  Regulations); *id*. at 13-14 (explaining deliberate indifference requirement imposed by 2020

15  Regulations).

16                                   **ARGUMENT**

17  **I.      Texas Is Not Entitled To Intervene As Of Right**

18        Under Federal Rule of Civil Procedure 24(a)(2), "a stranger to a lawsuit may intervene 'of

19  right' where . . . letting the lawsuit proceed without that person could imperil some cognizable

20  interest of his." *In re Volkswagen "Clean Diesel" Mktg.,* 894 F.3d 1030, 1037 (9th Cir. 2018).

21  That Rule is satisfied where (1) the motion is timely; (2) the would-be intervenor, or "applicant,"

22  "has a 'significantly protectable' interest relating to the property or transaction which is the subject

23  of the action;" (3) "the disposition of the action may as a practical matter impair or impede [the

24  applicant's] ability to protect that interest;" and (4) "the applicant's interest [is] inadequately

25  represented by the parties to the action." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d

26

27

28

836, 841 (9th Cir. 2011). "[T]he applicant bears the burden of showing each of the four elements is met," and its "[f]ailure to satisfy any one of the requirements is fatal to the application." *Id*.[4]

Here, Texas is not entitled to mandatory intervention because it does not have significant protectable interests directly affected by this litigation, disposition of this action will not impair or impede Texas's ability to protect its interests, and Texas's concerns that the federal government will not adequately represent its interests are speculative.

### A. Texas Has Not Established a Non-Speculative Protectable Interest Related to WSU's Claims

"An applicant seeking intervention is held to have a significant protectable interest in an action if (1) the applicant asserts an interest that is protected under some law, and (2) there is a relationship between the applicant's legally protected interest and the plaintiff's claims." *United States v. Sprint Comm., Inc.*, 855 F.3d 985, 991 (9th Cir. 2017) (internal quotation marks and citation omitted). That interest must be "non-speculative" and "concrete and related to the underlying subject matter of the action." *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004); *see also Habeas Corpus Res. Ctr. v. U.S. Dep't of Just.*, 627 F. App'x 662, 663-64 (9th Cir. 2015) (denying intervention because alleged interest was too speculative); *Greene v. United States*, 996 F.2d 973, 977 (9th Cir. 1993) (same); *Med. Advocates for Healthy Air v. EPA*, No. 11-3515, 2011 WL 4834464, at *5 (N.D. Cal. Oct. 12, 2011) (same).

Texas never identifies what, exactly, its ultimate "interest" in this litigation is, but it tells two stories about how this suit might affect the state. ECF 84 at 11-13. First, Texas says that WSU's success would create "uncertainty" among Texas institutions that would spur Texas schools to adopt unnecessarily restrictive policies, which would in turn lead to litigation against those schools by people accused of sexual harassment. *Id*. at 11-12. Second, and related, Texas

---

[4] WSU does not contest that Texas's intervention is timely. For the reasons stated in its opposition to Texas's earlier motion to intervene, the state must establish Article III standing to intervene. *See* ECF 27 at 5-8. Because Texas has revised its putative protectable interests, WSU believes Texas has sufficiently pled standing at this stage.

1   says that the WSU's success would expand its schools' obligations and that, in response, its schools

2   would infringe on the rights of students accused of sexual harassment. *Id*. at 12-13.

3          These accounts are, for obvious reason, not the "mirror-image" of a high school club's

4   procedural injury, as Texas asserts. *See* ECF 84 at 11. And neither establishes a legally protected

5   interest for four primary reasons: (1) Texas's fear of litigation is speculative and attenuated from

6   this case, (2) Texas has the independent power to prevent the bad outcomes it fears WSU's suit

7   will cause, (3) Texas's insistence that WSU's success will sow mass confusion is not credible, and

8   (4) Texas has not identified an implicated interest protected under any law.

9          *First*, both of Texas's theories turn on the state's purported fear that, if the Department

10  returns to its earlier policies, Texas schools will again be exposed to litigation by students accused

11  of sexual harassment. But Texas does not identify a single such lawsuit it has ever faced that relates

12  to the portions of the 2020 Regulations that WSU challenges, and Plaintiff cannot find one. True,

13  some students and professors sanctioned for sexual harassment have filed suit against Texas

14  universities and university officials, alleging deficient disciplinary procedures. *See, e.g.*, *Walsh v.*

15  *Hodge*, 975 F.3d 475, 481-88 (5th Cir. 2020) (denying on qualified immunity grounds due process

16  claim brought by Texas professor fired for sexual harassment), *cert. denied*, No. 20-1128, 2021

17  WL 1072326 (U.S. Mar. 22, 2021); *Plummer v. Univ. of Houston*, 860 F.3d 767, 773-77 (5th Cir.

18  2017) (denying due process claims by Texas students disciplined for sexual harassment). But, as

19  with its first motion to intervene, Texas has not so much as attempted to demonstrate how this

20  Court's decision to strike down the relevant parts of the 2020 Regulations would cause increased

21  litigation. Any potential relationship seems particularly far-fetched given that WSU does not

22  challenge any provisions related to disciplinary procedures. Texas's purported fear that a return to

23  the Department's previous policies will spur litigation by people disciplined for harassment, then,

24  is far too speculative to constitute a legally protected interest. *See, e.g.*, *Habeas Corpus Res. Ctr.*,

25  627 F. App'x at 663-64 (denying intervention because alleged interest was too speculative where

26  it turned on independent actions of third parties).[5]

27  _____

28  [5] Another reason Texas's tale about litigation risk is implausible: By Texas's telling, the risk of
    litigation by accused harassers stemmed from "new mandates" within policy guidance published

This is one of the ways in which Texas's motion to intervene as a defendant here differs from Oregon's motion to intervene as a plaintiff in *California v. Health & Human Services*, 330 F.R.D. 248 (N.D. Cal. 2019). There, Oregon provided a motion and accompanying declaration from a senior government official explaining the concrete and near-certain ramifications a challenged regulation would have for the state, down to exactly how Oregon quantified the expected cost of the regulation to the state. *See* Decl. of Helene Rimberg, ECF No. 211, *California v. Health & Human Services*; Mot. to Intervene, ECF No. 210, *California v. Health & Human Services*, 2019 WL 11729816 (N.D. Cal. Jan. 7, 2019); *cf. Perry v. Schwarzenegger*, 630 F.3d 898, 905 (9th Cir. 2011) (concluding "claimed interest is without merit" where intervenor "fail[ed] to substantiate its 'direct financial interest' with any evidence, such as affidavits of financial officers or county records"). Here, Texas offers no basis to believe its vaguely defined doomsday predictions are plausible, let alone likely.

*Second*, the state has the power to stop its parade of horribles in its tracks—another reason Texas's predicted injuries are speculative, farfetched, and insufficiently connected to this case. Both of Texas's theories rely on the state's concern that, in the absence of the 2020 Regulations, its own schools will unnecessarily design bad policies, a risk presumably within Texas's control to avoid. ECF 84 at 11-12. If Texas fears that, without the challenged portions of the 2020 Regulations, its schools will "[i]n an abundance of caution" adopt over-broad policies, *id.* at 12, the state can advise them not to do so. But it has failed to provide evidence or even plausible allegations to demonstrate that the success of this lawsuit, and the striking of the particular provisions at issue here, will force schools to take such steps. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417 (2013) (holding plaintiffs could not establish standing based on injuries resulting from their own decisions motivated by fear of speculative future government action). After all, although Texas gestures broadly at its objections to Obama-era Title IX guidance documents, it

---

by President Obama's administration. ECF 84 at 3-4, 11-12. But, with respect to the four provisions challenged here, the Department's positions were consistent for *decades* before the 2020 Regulations. *See* Am. Compl. ¶¶ 25-28, ECF 78. If Texas were right, then, that the Obama-era policy guidances spurred litigation by accused harassers, that could not be attributed to the guidances' positions corresponding to the provisions at issue here.

1  never actually argues that OCR's previous positions on any of the four items in question here

2  required schools to violate another legal commitment.[6]

3          *Third*, Texas's insistence that WSU's success will cause mass confusion in the state is not

4  credible. *See Perry*, 630 F.3d at 905 (denying mandatory intervention where applicants' worry that

5  disposition of case would lead to confusion was disconnected from reality of relevant law). Prior

6  to the 2020 Regulations, OCR retained consistent definitions and standards for evaluating federal

7  administrative sexual harassment complaints for decades. *See supra* pages 2-3. They were the same

8  definitions and standards OCR has used for all other forms of harassment since 1994, and the same

9  standards the EEOC and courts have applied to harassment claims under Title VII since the 1980s.

10 *See id*. Texas state education law, too, defines sexual harassment as "unwelcome, sex-based verbal

11 or physical conduct that . . . is sufficiently severe, persistent, *or* pervasive." Tex. Educ.

12 Code § 51.251(5) (2020) (emphasis added); *see also* Tex. Labor Code § 21.106 (defining sexual

13 harassment more broadly for workplaces). Indeed, some of Texas's flagship universities continue

14 to employ internal policies that align with the Department's pre-August 2020 positions.[7] Texas

---

15

16 [6] For an explanation of the lack of causative relationship between Obama-era Title IX policy
   guidance and subsequent allegation of unfair disciplinary procedures, see Samuel R. Bagenstos,
17 *What Went Wrong With Title IX?*, Washington Monthly (Sept./Oct. 2015),
   https://washingtonmonthly.com/magazine/septoct-2015/what-went-wrong-with-title-ix/.

18 Texas only purports to provide one example of a supposed tension between the Department's
19 previous Title IX guidance and accused students' rights. *See* ECF No. 84 at 12 n.17 (citing 2011
   Dear Colleague Letter at 12). The passage Texas cites reminded schools that they must respect
20 both accused students' due process rights and complainants' Title IX rights when investigating
   sexual harassment allegations. *See* 2011 Dear Colleague Letter at 12. But, even if Texas's reading
21 of the guidance were correct, it is irrelevant to this suit, which does not challenge the 2020
22 Regulations' procedural requirements, and so does not relate to accused students' due process
   rights.

23 [7] *See, e.g.*, University of Texas at Austin, Handbook of Operating Procedures 3-3031, Prohibition
24 of Sexual Assault, Interpersonal Violence, Stalking, Sexual Harassment, and Sex Discrimination
   (Aug. 12, 2020), https://policies.utexas.edu/policies/prohibition-sex-discrimination-sexual-
25 harassment-sexual-assault-sexual-misconduct ("This Policy applies to off-campus conduct when
   the conduct substantially affects a person's education or employment with the University or poses
26 a risk of harm to members of the University community."); Texas A&M, Department of Civil
27 Rights and Equity Investigations, Prohibited Conduct (last visited Oct. 20, 2021),
   https://titleix.tamu.edu/about/prohibited-conduct/ ("Some forms of gender or sex-based
28 misconduct are considered Prohibited Conduct if such behavior is so severe, persistent, *or*
   pervasive that it unreasonably affects an individual's employment, work or educational

---

and its schools, then, have decades of experience addressing harassment against students and employees under those standards – and continue to do so today. If this Court were to vacate any of the four items in question, leading to the reinstating of OCR's past interpretations of Title IX related to the challenged provisions, Texas could certainly handle it.

*Finally*, Texas has not demonstrated that its interests are legally protectable. Even if the Court were to credit Texas's accounts concerning the impact of WSU's success, the state offers no argument that it has, say, a *legally protectable* right not to be confused, or a *legally protectable* right not to be sued. And, to the extent Texas's interest is financial, as the state suggested in its last motion to intervene, it does not explain why that interest is legally protected, either. It is not enough for an applicant to have an economic stake in a suit; the economic interest must be protected by law. *E.g.*, *Alisal*, 370 F.3d at 919; *Greene*, 996 F.2d at 976; *Nikon Corp. v. ASM Lithography B.V.*, 222 F.R.D. 647, 650-51 (N.D. Cal. 2004); *see also Ctr. for Biological Diversity v. Jewell*, No. C 13-1749 PSG, 2013 WL 4127790, at *3 (N.D. Cal. Aug. 9, 2013) (noting the types of economic interests that suffice include "personal property, contracts, or permits").

## B.  Texas Will Have Other Opportunities to Defend Its Interests

Even if Texas had a concrete, non-speculative, legally protected interest tied to WSU's specific claims, it would not be entitled to mandatory intervention because it will have many other opportunities to protect that interest. *See, e.g.*, *Alisal*, 370 F.3d at 918 (holding that applicant had protectable interest but could protect that interest through separate avenues); *United States v. City of Los Angeles*, 288 F.3d 391, 402 (9th Cir. 2002) (same).

*First*, if the Department ever investigated a Texas school for Title IX violations, the state would have a series of opportunities to press its view of the statute's proper definition and standards. In its brief, Texas fear-mongers that schools must follow the Department's interpretation of Title IX or they risk the Department's unilateral, speedy, and unreviewable revocation of federal funds. Not so. By statute and regulation, OCR must provide funding recipients notice and an opportunity to come into compliance with Title IX before it initiates

performance, or creates an intimidating or hostile work, educational, or campus living environment." (emphasis added)).

proceedings to withdraw federal funds. 20 U.S.C. § 1682; 34 C.F.R. § 106.71 (incorporating § 100.8[8] During that voluntary resolution period, Texas could change its policies, or it could explain why its interpretation of Title IX is the correct one. If its arguments were unsuccessful and the school refused to come into compliance, the Department might then initiate a formal process to revoke funding before an administrative law judge – during which, once again, Texas would be able to press its legal theories, this time with the opportunity for an administrative hearing. 34 C.F.R. § 100.8(c); *id*. Pt. 101 (regulations governing administrative hearings). And if that judge were unpersuaded and authorized a withdrawal of funds, the Department would need to notify Congress of its decision and wait another thirty days. 20 U.S.C. § 1682. During that time, Texas could sue the Department for enforcing Title IX in a manner inconsistent with the Constitution or the statute. 20 U.S.C. § 1683 (authorizing review under the Administrative Procedure Act). Texas, then, does not need to intervene in WSU's suit to defend its interest. *See, e.g.*, *City of Los Angeles*, 288 F.3d at 402 (holding movants not entitled to intervention as of right where they could file their own suits if subjected to unconstitutional abuses by the defendant).

*Second*, even absent an enforcement action, the Department can engage in its own prophylactic litigation to compel favorable regulations. In its proposed Answer, Texas notes his intention to advance an affirmative defense that that the relief WSU seeks would be unconstitutional—that is, that the challenged provisions of the 2020 Regulations are constitutionally required. *See* ECF 83 at 22. If WSU succeeds, Texas "is at liberty to initiate litigation alleging that the [challenged provisions are] required by the Constitution." *New York v. U.S. Dep't of Educ.*, No. 20-CV-4260 (JGK), 2020 WL 3962110, at *3 (S.D.N.Y. July 10, 2020), *vacated on other grounds, appeal dismissed* (Mar. 20, 2021). Then, when the Department initiates Title IX rulemaking next year, Texas will have the opportunity to make its views known in the notice and comment period. 5 U.S.C. § 553. If the Department nonetheless adopts a rule contrary

---

[8] To WSU's knowledge, the Department has never withdrawn federal funding for a violation of Title IX. *See* Erin E. Buzuvis, *Title IX and Procedural Fairness: Why Disciplined-Student Litigation Does Not Undermine the Role of Title IX in Campus Sexual Assault*, 78 Mont. L. Rev. 71, 79 (2017).

1  to Texas's legal and policy positions, Texas could file its own challenge, just as WSU has done
2  here. 5 U.S.C. § 706.

3  ### C. Texas Has Not Overcome The Presumption of Adequate Representation

4      Texas is not entitled to intervention as of right for another reason: It has not overcome the
5  presumption that the Defendant will adequately represent its interests. "Where [a] party and the
6  proposed intervenor share the same ultimate objective, a presumption of adequacy of
7  representation applies." *Geithner*, 644 F.3d at 841 (internal quotation marks omitted). And "[i]n
8  the absence of a very compelling showing to the contrary, it will be presumed that a [government]
9  adequately represents its citizens when the applicant shares the same interest." *Arakaki v.*
10 *Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003) (internal quotation marks omitted). Crucially, "the
11 mere change from one presidential administration to another, a recurrent event in our system of
12 government," is insufficient to rebut these twin presumptions. *United States v. City of Los Angeles*,
13 288 F.3d 391, 403 (9th Cir. 2002). So too are "[c]ampaign rhetoric and perceived philosophical
14 differences." *Id*. at 403.

15      *1.  Texas Has Not Demonstrated the Defendant Does Not Share Its Objective*

16      Texas's objective is to protect the 2020 Regulations; courts generally assume a government
17 will defend its own policies. *See, e.g.*, *Geithner*, 644 F.3d at 841; *Valley View Health Care, Inc. v.*
18 *Chapman*, No. 1:13-CV-0036-LJO-BAM, 2013 WL 4541602, at *8 (E.D. Cal. Aug. 27, 2013);
19 *see also Victim Rts. L. Ctr. v. Rosenfelt*, 988 F.3d 556, 561 (1st Cir. 2021) (starting with "a
20 rebuttable presumption that the government will defend adequately its action"). The state asserts
21 that its participation is nonetheless necessary given "the Biden Administration['s] . . . open
22 hostility to the [2020 Regulations]." ECF 19-1 at 18. But the Administration has expressed no such
23 view. All Texas can point to is campaign rhetoric and the Department's announced plan to engage
24 in some form of Title IX rulemaking consistent with the administration's belief that sex
25 discrimination is bad. *Id*. at 15. Indeed, as this Court previously noted, "[t]here is no guarantee that
26 the Department will rescind the Regulations," given that President Biden's executive order "only
27 instructs the Department to 'review' the Regulations" and "Secretary Goldberg's letter does not

28

indicate exactly how the Department intends to change the Regulations." ECF 56 at 2 (denying Defendant's motion to stay). Plus, none of the Administration's statements say anything at all about the four particular provisions WSU challenges here. And there is no question that the Department continues to enforce the 2020 Regulations as written. *See supra* page 5.

Texas suggests that "[t]his suit bears characteristics of sue and settle litigation," *id*. at 14, and that "[t]he Department has a clear incentive—and intent—to capitulate to Plaintiff's demands," *id*. at 16. But as Texas well knows, the Department has vigorously and skillfully defended this lawsuit, successfully moving to dismiss WSU's first complaint. *See* ECF 75. And, in a sworn declaration, the Department has already represented to the Court that it plans to move to dismiss WSU's amended complaint as well. *See* ECF 79-1. The Court does not need to predict, then, whether the Department will defend this lawsuit. It knows it will.

The Department's decision not to cross-appeal the district court's ruling in *Victim Rights Law Center v. Cardona* is insufficient to establish inadequate of representation at this stage. In that case, a group of plaintiffs challenged the entirety of the 2020 Regulations. *Victim Rts. L. Ctr. v. Cardona*, -- F.Supp.3d ---, 2021 WL 3185743, at *1 (D. Mass. July 28, 2021), *order clarified*, No. CIV 20-11104-WGY, 2021 WL 3516475 (D. Mass. Aug. 10, 2021). The Department's defense was largely successful, save for one ancillary evidentiary rule applicable only to hearings conducted by colleges and universities. *See id*. at *19. That rule is not at issue in this suit, *see generally* Am. Compl.; ECF 78; WSU would not have standing to challenge it, since it does not apply to K-12 schools at all, *see* 34 C.F.R. § 106.45(b)(6)(i). And it is little surprise the Department decided not to defend that portion further on appeal: The provision was so facially nonsensical that, even before the effective date, the Department was forced to publish a notice explaining that it would not enforce that evidentiary rule according to its plain text, given the absurd results that would follow. *See* Office for Civil Rights Blog – 20200522 (May 22, 2020), https://www2.ed.gov/about/offices/list/ocr/blog/20200522.html. The Defendant's decision not to file a cross-appeal to defend one narrow provision irrelevant to this litigation, then, is insufficient to overcome the uncontroverted evidence that the Defendant has and will continue to defend

against WSU's suit. Besides, if Texas fears that the Department will fail to appeal an adverse outcome in this case, the solution is simple: Texas could intervene at that juncture, just as it did in *Victim Rights Law Center*. *See* ECF 84 at 2 n.2; *see also Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*, 101 F.3d 503, 509 (7th Cir. 1996) (Posner, J.) (explaining "[t]he proper way to handle" the possibility that a government defendant will not appeal "when as here no present inadequacy of representation can be shown").[9]

> ### 2. Texas's Belief that the Defendant Will Make Different Legal Strategic Decisions is Insufficient to Demonstrate Inadequate Representation

Texas also raises, in passing, its desire to "introduce[e] an issue or defense not raised by the parties," ECF 84 at 14, perhaps a reference to its constitutional affirmative defense, *see supra* page 11. Strategic differences, however, do not amount to different ultimate objectives. *See United States v. City of Los Angeles*, 288 F.3d 391, 402-03 (9th Cir. 2002) ("[D]ifferences in strategy . . . are not enough to justify intervention as a matter of right."); *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 838 (9th Cir. 1996), *as amended on denial of reh'g* (May 30, 1996) (same).

Plus, Texas's insistence that it must intervene to make unspecified arguments unsupported by the government is particularly strained given the nature of an APA suit. "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). As a result, the 2020 Regulations can only be defended based on a fixed universe of justifications already endorsed by the Department. If Texas thinks the rule is good policy for a separate reason, that is not a legal basis for intervention.

---

[9] With confidence, Texas asserts "why the Department refused to pursue an appeal in *Victim Rights Law Center*." ECF 85 at 16. Yet the email Texas cites in support offers no explanation at all. Although Texas appears to believe this current administration invented the idea of not appealing every district court loss, and does so to circumvent required procedures nefariously, *see* ECF 84 at 16, there are many reasons why the Department of Justice declines to appeal, *see Solid Waste Agency of N. Cook Cty.*, 101 F.3d at 508-09.

Texas previously argued that it can advance new arguments, including its proposed affirmative defense, because "constitutional and policy consideration bear on the question of whether a government agency acted rationally when promulgating policy." ECF 29 at 14. Undoubtedly, an agency should consider the legal and practical ramifications of its actions during the rulemaking process. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) ("[A]n agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem"). Indeed, its failure to do so might be a reason to strike down a regulation. *See, e.g.*, *id.* at 51 (holding regulation was unlawful because agency ignored important consideration). But the law could not be clearer: An agency action may only be defended based on "contemporaneous explanations," to the exclusion of "*post hoc* rationalizations." *Dep't of Homeland Sec.*, 140 S. Ct. at 1907-10.[10]

\*\*\*

For the above reasons, Texas is not entitled to intervention as of right.

## II.    The Court Should Deny Texas Permissive Intervention

Texas also fails to meet the requirements for permissive intervention. Under Federal Rule 24(b)(1)(B), a court may exercise discretion to grant permissive intervention to an applicant that "shows (1) independent grounds for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or defense, and the main action, have a question of law or a question of fact in common." *Perry v. Proposition 8 Off. Proponents*, 587 F.3d 947, 955 (9th Cir. 2009). Even if an applicant meets the threshold jurisdictional, timeliness, and commonality requirements, a district court

---

[10] In its reply in support of its first motion to intervene, Texas took issue with WSU "theorizing" about what unique arguments and defenses the state would like to press in this case. ECF 29 at 11 & n.8. It is hardly unreasonable for WSU, and the Court, to assume that Texas intends to press the affirmative defense that the state says, in its proposed Answer, it intends to press. *See* ECF 83 at 22. And Texas never disclaimed that it would advance these arguments, only quarreling with whether WSU could *know* the state's plans. *See, e.g.*, ECF 29 at 14 (noting that "Plaintiff has no basis to assume that Texas will tender any specific argument" but arguing that "if Texas were to raise such arguments," it would be permitted to do so). But if WSU's assumption is wrong, then Texas's motion fails for another reason: The state cannot insist that it must be allowed to intervene because of the importance of arguments it never identifies. Without that information, the Court cannot assess whether these arguments are so crucial that the Defendant's expected failure to advance them renders it an inadequate representative.

1   nonetheless retains broad discretion to deny permissive intervention. *Donnelly v. Glickman*, 159

2   F.3d 405, 412 (9th Cir. 1998). In exercising that discretion, courts "must consider whether the

3   intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R.

4   Civ. P. 24(b)(3). The Court may also consider factors – sometimes known as "*Spangler* factors"

5   after an influential case – including "the nature and extent of the intervenors' interest, their

6   standing to raise relevant legal issues, the legal position they seek to advance, and its probable

7   relation to the merits of the case . . . , [and] whether the intervenors' interests are adequately

8   represented by other parties." *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th

9   Cir. 1977).

### A. Texas's Alleged Interests are Too Speculative and Attenuated from WSU's Claims

12      As with mandatory intervention, permissive intervention is not appropriate where, as here,

13   the applicant's interests are "nonexistent, contingent on future events, or tangential to th[e]

14   proceeding." *Mishewal Wappo Tribe of Alexander Valley v. Salazar*, No. 5:09-CV-02502 EJD,

15   2012 WL 4717814, at *6 (N.D. Cal. Sept. 28, 2012), *aff'd*, 534 F. App'x 665 (9th Cir. 2013). In

16   such a circumstance, the applicant's defense and the main action lack a common question of law

17   or fact – a threshold requirement for permissive intervention. *See id.*; *see also Med. Advocates for

18   Healthy Air v. EPA*, No. 11-3515, 2011 WL 4834464, at *5 (N. D. Cal. Oct. 12, 2011) (holding

19   applicant failed to make threshold showing for permissive intervention because its alleged interests

20   were speculative and too attenuated from the plaintiff's case case). The discretionary *Spangler*

21   factors also weigh against granting intervention when an applicant's interests are so speculative

22   and attenuated from the plaintiff's action. *See Spangler*, 552 F.2d at 1329 (noting court may

23   consider "the nature and extent of the intervenors' interest" and their positions' "probable relation

24   to the merits of the case").

25      As described above, Texas's alleged interests in this litigation are highly speculative with

26   no established connection to WSU's claims. *See supra* pages 6-10 (explaining why Texas's

27   interests are speculative and attenuated). Texas clearly supports, and believes it benefits from, the

28

*Plaintiff's Opposition to Texas's Motion to Intervene - 3:21-cv-01626-EMC*          16

2020 Regulations as a whole. But it has not established an interest in the four specific provisions WSU challenges. As such, Texas cannot establish the requisite common question of law or fact related to the specific claims at issue in this case, and the *Spangler* factors discourage permissive intervention as well.

### B.   Texas Has Not Overcome the Presumption that the Defendant Will Represent its Interests

As with intervention as of right, "the adequacy of representation alone is a sufficient ground to deny permissive intervention." *Carroll v. Wells Fargo*, No. 15-02321, 2016 WL 3951650, at *1 (N. D. Cal. July 22, 2016) (Chen, J.); *see also Spangler*, 552 F.2d at 1329 (noting court may consider "whether the intervenors' interests are adequately represented by other parties"). For the reasons explained above, Texas has failed to overcome the presumptions that the Defendant will adequately represent the state's putative interests. *See supra* Part I.C.

### C.   Texas's Intervention Will Cause Undue Delay and Prejudice.

Just as important here is a concern that uniquely dominates consideration of permissive intervention: potential "undu[e] delay or prejudice [of] the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Intervention will cause such an effect if it will insert into the case "extraneous legal and factual issues that [the plaintiff's] lawsuit would not otherwise invoke." *Apple Inc. v. Iancu*, No. 20-06128, 2021 WL 411157, at *6 (N.D. Cal. Feb. 5, 2021) (quoting *UMG Recordings, Inc. v. Bertelsmann AG*, 222 F.R.D. 408, 414 (N.D. Cal. 2004)). "Such allegations would divert time and resources from the principal thrust of [the plaintiff's] lawsuit and entangle the legal and factual issues involved therein within a web that is not of the original parties' making." *Id.*; *see also Sierra Club v. EPA*, No. 13-2809, 2013 WL 5568253, at *5 (N.D. Cal. Oct. 9, 2013) (denying permissive intervention because applicant's claims were "not at issue in th[e] litigation" and "opening the door to . . . additional contentions would only serve to confuse the matters at issue in the complaint").

Texas's intervention would cause exactly this effect. Texas repeatedly notes its desire to make arguments and defenses that, it believes, the Department will not. *See* ECF 84 at 14, 18. The

state's motion does not identify what, exactly, these crucial arguments and defenses might be. But, as discussed above, Texas's proposed Answer indicates its intention to press an affirmative defense that the challenged provisions are constitutionally required. *See* ECF 83 at 22. Such arguments are well outside the scope of WSU's suit, threatening to turn this narrow APA litigation into a referendum on the constitutional bounds of sexual harassment law. *See, e.g.*, *Victim Rts. L. Ctr. v. Rosenfelt*, 988 F.3d 556, 562-63 (1st Cir. 2021) (denying intervention in challenge to 2020 Regulations because concerns about the constitutionality of alternative rules are outside the bounds of the case); *New York*, No. 20-CV-4260 (JGK), 2020 WL 3962110, at *3 (same); *see also supra* pages 14-15 (explaining why Texas cannot defend the 2020 Regulations using a *post hoc* justification not relied on by the Department). Undoubtedly, they will distract from the legal issues actually present in the case. For these reason, the Court should deny permissive intervention. *Cf. Apple Inc.*, No. 20-06128, 2021 WL 411157, at *6 (denying permissive intervention because it "[ran] the risk of transforming the case from one assessing a single agency rule to one evaluating an effort to compel rulemaking").

## CONCLUSION

For the above reasons, WSU respectfully asks the Court to deny Texas's motion to intervene.

Date: November 22, 2021                    Respectfully submitted,

 _/s/ Lauren A. Khouri_
Linda M. Correia*                          Adele P. Kimmel (CA Bar No. 126843)
Lauren A. Khouri*                          Alexandra Z. Brodsky*
Correia & Puth, PLLC                       Public Justice
1400 16th Street NW, Suite 450             1620 L Street NW, Suite 630
Washington DC 20036                        Washington, DC 20036
Ph: (202) 602-6500                         Ph: (202) 797-8600
Fax: (202) 602-6501                        Fax: (202) 232-7203
Email: lcorreia@correiaputh.com            Email: akimmel@publicjustice.net
        lkhouri@correiaputh.com                    abrodsky@publicjustice.net


                                           John He (CA Bar No. 328382)
                                           Public Justice
                                           475 14th Street, Suite 610
                                           Oakland, CA 94612
                                           Ph: (510) 622-8150
                                           Fax: (202) 232-7203
                                           Email: jhe@publicjustice.net

                                           * _admitted pro hac vice_